752 A.2d 315

GREEN PARTY OF NEW JERSEY AND JAMES MOHN, PLAIN-
TIFFS–APPELLANTS, v. HARTZ MOUNTAIN INDUSTRIES,
INC., D/B/A THE MALL AT MILL CREEK, DEFENDANT–RE-
SPONDENT.

Argued March 28, 2000—Decided June 13, 2000.

130

*Frank Askin* on behalf of the American Civil Liberties Union of New Jersey argued the cause for appellants.

*Curtis L. Michael* argued the cause for respondent (*Horowitz Rubino & Patton,* attorneys).

*Bennet D. Zurofsky* argued the cause for *amici curiae* New Jersey Peace Action, New Jersey Industrial Union Council, AFL–CIO and New Jersey Labor Party (*Reitman Parsonnet,* attorneys).

*James M. Hirschhorn* argued the cause for *amicus curiae* International Council of Shopping Centers (*Sills Cummins Radin Tischman Epstein & Gross,* attorneys; *Mr. Hirschhorn* and *Jeffrey H. Newman,* of counsel and on the brief).

The opinion of the Court was delivered by

O'HERN, J.

In this appeal, plaintiffs seek access to a shopping mall in order to gather signatures on behalf of a candidate for Governor of the State of New Jersey. The appeal is a sequel to the Court's ruling in *New Jersey Coalition Against War in the Middle East v. J.M.B. Realty,* 138 *N.J.* 326, 650 *A.*2d 757 (1994), *cert. denied,* 516 *U.S.* 812, 116 *S.Ct.* 62, 133 *L.Ed.*2d 25 (1995) (*Coalition* ).

In *Coalition,* the Court held that regional and certain community shopping mall owners must allow on their premises leafletting

and associated political and societal speech, subject to reasonable time, place, and manner restrictions. The central question in this appeal is what legal standard should determine the reasonableness of regulations governing the exercise of free speech activities at those shopping centers. In addition, the Court must apply this standard to three regulations adopted by a shopping mall. The first regulation requires non-profit organizations seeking to hand out leaflets at the mall to provide a $1,000,000 insurance policy. The second regulation requires those wishing to hand out leaflets to sign a "hold harmless" clause as a condition of having access to the mall. The third regulation requires organizations to limit their access to the mall to "one day, or a few days a year." Not before us are the issues that divided the *Coalition* Court. Our extended discussion of the *Coalition* decision is intended only to aid in our review of the application of its principles by the courts below to the issues at hand.

The Chancery Division held that malls may impose reasonable content-neutral time, place, and manner restrictions on free speech. Because the *Coalition* Court found regional shopping centers to be *de facto* traditional public forums, the Chancery Division ruled that regulations of expressive activities should be narrowly tailored to promote a substantial business interest of the mall. In applying this standard, the Chancery Division invalidated all three of the mall regulations. On appeal, the Appellate Division reversed. 324 *N.J.Super.* 192, 735 *A.*2d 9 (1999). Interpreting language in *Coalition*, the court adopted a "reasonable business judgment" standard that granted the mall broad powers to regulate the limited free speech right to leaflet. Applying this test, the panel upheld all three regulations as good faith means of protecting the mall's private property interests and preventing certain groups from monopolizing access to the mall. We granted certification, 163 *N.J.* 12, 746 *A.*2d 458 (2000), and now reverse.

I.

The case arises as a test case following the grant of interim relief during the 1996 and 1997 election cycles. Both courts held,

and we agree, that the issues are recurring and deserve review although technically moot. Some of the evidence in the case came from affidavits filed in connection with the applications for emergency relief, some came at a plenary hearing in the Chancery Division, and some by later stipulations. There is no basic disagreement over the facts. Because the Appellate Division provided a thorough discussion of the facts, only a summary follows.

### A.

James Mohn, a resident of Guttenberg, had been actively involved with the New Jersey Draft Nader for President Committee ("Nader Committee") in 1996 and thereafter with the Green Party of New Jersey. He also participated in membership and voter registration drives and leafletting for other organizations, including the New Jersey Peace Action, Witness for Peace, the Arab–American Anti–Discrimination Committee, and the Rainbow Coalition.

The Mall at Mill Creek ("Mall") is owned by Hartz Mountain Industries and is located in Hudson County. Because nearby Bergen County enforces "blue laws," Mohn considered soliciting petition signatures at the Mall important as numerous Bergen County residents would visit the Mall on Sundays. In addition, he believed that the Mall was a gathering place for large numbers of people on other days of the week, an enclosed area that was preferable during bad weather, and near his home. Approximately three times a week, Mohn and his wife went to the Mall as "Merry Milers" to walk for exercise in the mornings.

The Mall contains about 325,000 square feet of "gross leasable area," but only approximately 35,000 square feet of common area open to the public. In *Coalition,* the Law Division described the Mall as a community shopping center [1] situated on twenty-seven

---

[1] In *Coalition,* the Supreme Court acknowledged the difference between regional and community shopping centers in the industry. 138 *N.J.* at 338–339,

acres of land in Secaucus, located near the New Jersey Turnpike Exit 16E and Route 3. The Mall has three public entrances and a single-floor layout, which is roughly a straight line passageway between two anchor stores. Both ends and sides of the Mall are lined by stores, with enlarged common areas at each end and midpoint. Kiosks, carts, and tables fill a narrow band of common area at the center of the passageway and in the three enlarged areas.

In September 1996, Mohn requested space to set up an information table at the Mall on behalf of the Nader Committee.[2] In response, the Mall sent Mohn a copy of its license agreement and regulations, which provided in part:

The following comprise the regulations of the Mall at Mill Creek for informational activities of non-profit organizations, individuals, or entities (collectively "Permittee"). The Mall at Mill Creek has afforded reasonable access for community and non-profit groups desiring to use the Mall for informational activities. However, informational activities must be conducted in a manner so as not to disturb Mill Creek's customers or tenants. Mill Creek reserves the right to change these rules at any time.

---

650 A.2d 757. A regional shopping center is defined as one that provides a full variety of shopping goods, general merchandise, apparel, furniture and home furnishings. It contains a full-line department store with a minimum gross leasable area ("GLA") of 100,000 square feet. GLA refers to "the total floor area designed for tenant occupancy and exclusive use.... GLA is the area for which tenants pay rent." National Research Bureau, 1991 *Directory of Shopping Centers in the United States*, Eastern Volume (1990). The regional shopping center has a total GLA ranging from 300,000 to more than 1,000,000 square feet. National Research Bureau, *Shopping Center Directory 1994*, Eastern Volume (1993). A community shopping center is smaller than a regional shopping center and lacks the completeness of merchandise available at a regional mall. A community shopping center is defined as one that includes a wide range of facilities for the sale of soft lines (apparel) and hard lines (hardware, appliances, etc.). It contains a junior department store, variety store or discount department store. The typical size of a community center ranges from 100,000 to 300,000 square feet. The Mall was a party to *Coalition* and does not dispute its coverage under *Coalition*.

2 Ralph Nader is nationally known as a consumer advocate, lawyer, and author. He has alerted the public to numerous issues related to workers' health and safety, environmental pollution, and excessive corporate influence. Nader is currently the Green Party candidate for President of the United States.

1. Activities are generally limited to one day per year between January 1 and October 31, unless otherwise approved by Mall Management upon written request.[3]

. . . .

9. Permittee must provide a valid Certificate of Insurance, including general liability insurance in the combined single limit of $1,000,000. The certificate must contain an endorsement in the form contained in the License Agreement.

10. Permittee must sign the enclosed License Agreement.

The license agreement further provided:

Licensee shall protect, indemnify, save and keep harmless Licensor against any and all claims, loss, cost, damage or expense of any kind or nature, whatsoever, arising out of or from (i) any accident or occurrence in, on or at the Premises, and (ii) any act or omission of Licensee, its employees, servants, agents or invitees. In the event the Mall or Hartz shall, without fault on its part, be made a party to any litigation commenced by or against Licensee, Licensee shall protect and hold the Mall and Hartz harmless and shall pay all costs, expenses and reasonable attorneys' fees incurred or paid by the Mall or Hartz in connection with such litigation.

In addition, the license agreement required an insurance endorsement naming "Hartz Mountain Industries, Inc. and its respective subsidiaries, affiliates, associates, joint ventures and partnerships as additional insured."

On October 14, 1996, Mohn received a quotation of $665 from an insurance agency for $1,000,000 in liability insurance for the Nader Committee. Believing that the costs were prohibitive, Mohn and the Nader Committee filed suit and obtained an order that allowed them to leaflet at the Mall on October 27 without providing an insurance certificate. When Mohn leafletted at the Mall in 1996 for the Nader Committee, there were no incidents.

---

[3] Other regulations not at issue in this appeal require that (a) the organization provide its own table, covered to the floor on all sides; (b) have professionally printed signs; and, (c) submit a $100 cleanup deposit which "will be refunded if no unusual cleanup is required upon completion of Permittee's activities." In 1998, Hartz revised its first numbered regulation for nonprofit informational activities to provide: "Activities are generally limited to one day, or a few consecutive days per year, between January 1 and October 31, upon approval by Mall management." The Mall has since revised its regulations to eliminate the word "consecutive."

## B.

In March 1997, Mohn was in the process of organizing the Green Party of New Jersey. On January 25, 1997, the Party was established at a meeting of about forty people, most of whom had been members of the Nader Committee, at the Rutgers Labor Education Center in New Brunswick.[4] After the formation of the Green Party, plaintiffs amended their complaint to replace the Nader Committee with the Green Party as plaintiff. The Green Party then sought to obtain 2,000 ballot signatures on its nominating petition for its gubernatorial candidate in 1997.

While seeking signatures for the petition in other locations, Mohn had handed out a flier that described the Green Party, its candidate, and positions. If granted access, Mohn intended to use that document in his leafletting and collection of petition signatures at the Mall.

Richard Lofberg, a licensed property and casualty underwriter, a witness for the Mall, explained that shopping centers require insurance of their tenants and vendors for these reasons:

A mall is open to the public, it is a private location, a private site, because it is a private site the owner of that property is literally fully exposed to anything that happens, the slip and falls in shopping malls are horrendous, the rights of protection are really somewhat limited, considering what can happen there....

Lofberg stated that insurance was available for such risks, and that when a group is financially strong enough to carry part of that risk itself, it can use a "self-insured retention," also called a high deductible, to lower its insurance costs on a per claim or a per period basis. Lofberg also observed that the Nader Committee's insurance quotation did not contain a policy provision limiting the leafletting activities to one day, so that the $500 premium cost

---

[4] The Green Party of New Jersey places candidates on the ballot for many state and local elections. The Party's platform endorses ten values that are common to the national and international Green Parties. These values include "ecological wisdom, social justice, grassroots democracy, nonviolence, decentralization, community-based economics, feminism, respect for diversity, personal and global responsibility, and future focus/sustainability." *The Ten Key Values of the Greens,* (visited April 24, 1999) <*http://www.gpnj.org/tenval.html* >.

(plus $165 in taxes and fees) appeared to contemplate coverage for a full year at the Mall. He said that coverage for only one day would be rated differently.[5]

According to the Mall's Director of Insurance and Risk Management, the Mall's regular tenants were required to have insurance coverage at policy limits of $5,000,000 per occurrence, and the leases usually had a hold harmless provision. She noted that Hartz had a $1,250,000 per occurrence deductible and supplied a three-page listing of claims that the Mall had experienced for incidents that occurred between September 1993 and June 1996, which with expenses totaled $497,507.38. Plaintiffs dispute that claims made equate with claims paid. Most of the claims were for less than $35,000 each. There were two large claims in 1993 that totaled $220,000 and $101,030, respectively.

## C.

The Chancery Division reviewed free speech guarantees of the United States and New Jersey Constitutions and the *Coalition* decision. The court also reviewed four California cases that concerned similar shopping mall restrictions.[6] The court interpreted those cases as applying the same standard that the United States Supreme Court applies to governmental restrictions on freedom of speech in a traditional public forum, namely that the government may impose reasonable content-neutral time, place

---

[5] Lofberg knew of some cases where malls required evidence of coverage for early morning jogging groups, but he thought that in most cases they did not, and the joggers and walkers were considered invitees. He did not know whether the Mall required coverage for a walking or jogging group.

[6] *Robins v. Pruneyard Shopping Ctr.*, 23 *Cal.*3d 899, 153 *Cal.Rptr.* 854, 592 *P.*2d 341 (1979), *aff'd*, 447 *U.S.* 74, 100 *S.Ct.* 2035, 64 *L.Ed.*2d 741 (1980); *H–CHH Assocs. v. Citizens for Representative Gov't*, 193 *Cal.App.*3d 1193, 238 *Cal.Rptr.* 841, *review denied* (Oct. 29, 1987), *cert. denied*, 485 *U.S.* 971, 108 *S.Ct.* 1248, 99 *L.Ed.*2d 446 (1988); and *Savage v. Trammell Crow Co.*, 223 *Cal.App.*3d 1562, 273 *Cal.Rptr.* 302, *review denied* (Dec. 13, 1990), *cert. denied*, 500 *U.S.* 906, 111 *S.Ct.* 1685, 114 *L.Ed.*2d 80 (1991); *Union of Needletrades, Indus. & Textile Employees v. Superior Court*, 56 *Cal.App.*4th 996, 65 *Cal.Rptr.*2d 838 (1997).

and manner restrictions, but those restrictions must be narrowly drawn to promote its substantial interests. The Chancery Division adopted that standard for reviewing regulations imposed by private shopping malls in New Jersey, interpreting the rationale of *Coalition* as a holding that in New Jersey a shopping mall is a *de facto* traditional public forum.

The court considered the insurance requirement cost-prohibitive given the Party's limited funds. The court speculated that splinter political groups are often unable to secure insurance at any price and that the requirement was unnecessary because the Mall would not be vicariously liable for the conduct of the Green Party. The insurance requirement might also raise other constitutional issues, particularly if underwriters consider such matters as the political beliefs of applicants, the likelihood of adverse publicity to the insurer, the lack of business experience of the group, and other factors that are irrelevant or improper. *Eastern Conn. Citizens Action Group v. Powers*, 723 *F*.2d 1050, 1056 n. 2 (2d Cir.1983). The court concluded that because the insurance and hold harmless requirements were intertwined, they were unconstitutional "as a *de facto* ban on free[dom of] speech because compliance, if achievable, is cost prohibitive." [7]

### D.

On appeal, the Appellate Division reversed the Chancery Division's grant of summary judgment to plaintiffs. It held that the frequency regulation limiting distribution of leaflets for only "one day or a few consecutive days" per year was reasonable. In

---

[7] The court also stated that two other issues raised in the motion, regarding a "black-out" period during the holiday shopping season and a one group per day restriction, were not pled in the complaint and, therefore, were not properly before the court on the summary judgment motion. The court noted, however, that if these issues had been reached, it would have found each to be valid, as they were narrowly drawn to enable the Mall to keep common areas open, available for movement, and safe, in view of evidence regarding the Mall's limited amount of common space.

addition, the court held that the regulations requiring insurance and the signing of a "hold harmless" clause were not unreasonable as a matter of law. Its decision is reported at 324 *N.J.Super.* 192, 735 *A.*2d 9 (1999).

The court ruled that the Chancery Division applied the wrong standard, the "narrowly tailored" test, because the court had equated shopping malls with traditional public forums. Instead, the Appellate Division held that the Mall's regulations should have been evaluated under a "good faith exercise of reasonable business judgment" standard. *Id.* at 230, 735 *A.*2d 9. The Appellate Division extensively summarized the *Coalition* opinion, observing the limited nature of the free speech right and the broad power of the malls to regulate the exercise of the free speech right. *Id.* at 214–17, 735 *A.*2d 9.

In creating its standard for reviewing a shopping center's regulations of free speech activities, the panel applied this test:

(1) Is the regulation a reasonable means for assuring a private business, operating as a regional shopping center, that the constitutionally permitted freedom of speech activity does not interfere with the shopping center's business? In other words was the regulation a reasonable exercise of business judgment? (2) Applying the regulation to the circumstances presented, is the effectiveness of the applicant's proposed exercise of freedom of speech rights sufficiently maintained?

[*Id.* at 217–18, 735 *A.*2d 9.]

## II.

### The Nature of a State's Constitutional Authority to Require Speech on Private Property.

#### A.

New Jersey has been at the historical center of debate over speech and assembly. Richard T. Pfohl, Note, *Hague v. CIO and the Roots of Public Forum Doctrine: Translating Limits of Powers into Individual Rights*, 28 *Harv. C.R.-C.L.Rev.* 533 (1993). In *Hague v. CIO*, 307 *U.S.* 496, 59 *S.Ct.* 954, 83 *L.Ed.* 1423 (1939), the Court nullified content-based limitations on access to public forums. The case involved Mayor Hague's attempts to keep the Committee for Industrial Organization ("CIO") from organizing workers in Jersey City. A municipal ordinance required persons

wishing to assemble in public to apply for a permit, which the Director of Public Safety could refuse "for the purpose of preventing riots, disturbances or disorderly assemblage" in Jersey City. *Id.* at 502, 59 *S.Ct.* 954. Hague had repeatedly used this ordinance to prevent meetings of labor unions, socialists, and liberal advocates of freedom of expression, such as the American Civil Liberties Union. The Supreme Court affirmed an injunction against the use of the ordinance to bar labor organizers. In his concurring opinion, Justice Roberts set forth the classic definition of a public forum: "Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens and discussing public questions." *Id.* at 515, 59 *S.Ct.* 954.

In *Schneider v. State*, 308 *U.S.* 147, 60 *S.Ct.* 146, 84 *L.Ed.* 155 (1939), the Supreme Court reviewed an Irvington, New Jersey canvassing ordinance that required written permission from the chief of police for any form of door-to-door activities. Speaking for the Court, Justice Roberts wrote:

> This court has characterized freedom of speech and that of the press as fundamental personal rights and liberties. The phrase is not an empty one and was not lightly used. It reflects the belief of the framers of the Constitution that exercise of the rights lies at the foundation of free government by free men. It stresses, as do many opinions of this court, the importance of preventing the restriction of enjoyment of these liberties.

> [*Id.* at 161, 60 *S.Ct.* 146 (footnote omitted).]

"There is no doubt [then] that as a general matter, peaceful picketing and leafletting are expressive activities involving 'speech' protected by the First Amendment." *United States v. Grace*, 461 *U.S.* 171, 176, 103 *S.Ct.* 1702, 1706, 75 *L.Ed.*2d 736 (1983); *Carey v. Brown*, 447 *U.S.* 455, 460, 100 *S.Ct.* 2286, 2290, 65 *L.Ed.*2d 263 (1980); *Thornhill v. Alabama*, 310 *U.S.* 88, 60 *S.Ct.* 736, 84 *L.Ed.* 1093 (1940); *Lovell v. City of Griffin*, 303 *U.S.* 444, 58 *S.Ct.* 666, 82 *L.Ed.* 949 (1938). Had Mohn sought to collect signatures for Ralph Nader on a Secaucus street or park, he would have been free to do so.

## B.

At one time private property owners exercised virtually unfettered control over property. As social standards changed, the law changed to recognize the primacy of certain public interests over the rights of private property owners. In *Marsh v. Alabama,* 326 *U.S.* 501, 66 *S.Ct.* 276, 90 *L.Ed.* 265 (1946), the Court recognized that public interests could control not only what a landowner could do with its property (as through zoning laws) but also the owner's freedom to exclude or limit the conduct of the public on that property. Police had arrested Grace Marsh and others who had been distributing religious pamphlets outside the post office of a privately owned "company town." *Id.* at 503–04, 66 *S.Ct.* 276. Had Marsh been in any other town, the sidewalk near the post office would have been public property, and she would have had a First Amendment right to express herself freely on that public property. Focusing on the "fundamental liberties" of disseminating and receiving ideas, the Supreme Court held that the pamphleteers' constitutional rights had been abridged. It concluded that, except for ownership by a private corporation, the company town "has all the characteristics of any other American town." *Id.* at 501, 66 *S.Ct.* 276. Although acknowledging the significance of the property rights involved, the Court found it necessary to balance against those rights the constitutional right of free expression. The Court discussed the historical importance of town centers as a forum for the free exchange of ideas and information. No other location gives speakers the opportunity to convey their messages to their fellow citizens. People traveled from residential areas to the town center, rendering it the only forum in which a resident could communicate with other fellow citizens. The *Marsh* Court concluded that "when we balance the Constitutional rights of owners of property against those of the people to enjoy freedom of press and religion ... we remain mindful of the fact that the latter occupy a preferred position." *Id.* at 509, 66 *S.Ct.* 276.

In the years that followed *Marsh,* living patterns changed further. Suburban areas increased, and the suburban mall be-

came the new town center. In *Robins v. Pruneyard Shopping Center*, 23 *Cal.*3d 899, 153 *Cal.Rptr.* 854, 592 *P.*2d 341 (Cal.1979), *aff'd*, 447 *U.S.* 74, 100 *S.Ct.* 2035 64 *L.Ed.*2d 741 (1980), the California Supreme Court interpreted the State's constitution to guarantee the right of free expression in shopping centers and on comparable property. The *Pruneyard* court acknowledged that the First Amendment did not grant such broad protection, but it found that California could grant that protection. The court observed that property rights must yield to the public interests served by zoning laws, environmental laws and other legislation that limit the precise uses to which private property may be put. The *Pruneyard* court was persuaded that "all private property is held subject to the power of the government to regulate its use for the public welfare." *Id.* at 857, 592 *P.*2d at 344. It concluded that the state had the power consistent with the Constitution to grant that greater protection: "a handful of additional orderly persons soliciting signatures and distributing handbills in connection therewith, under reasonable regulations adopted by defendant to assure that these activities do not interfere with normal business operations would not markedly dilute defendant's property rights." *Id.* at 860–61, 592 *P.*2d at 347–48 (citation omitted).

The United States Supreme Court agreed. *PruneYard Shopping Center v. Robins*, 447 *U.S.* 74, 100 *S.Ct.* 2035, 64 *L.Ed.*2d 741, (1980). It held that states may adopt greater free speech rights than those guaranteed by the First Amendment. *Id.* at 80–81, 100 *S.Ct.* 2035. Responding to the mall's argument that California's ruling amounted to a taking, the Court found that permitting speech did not so diminish the property's value as to be an unconstitutional infringement. *Id.* at 82–85, 100 *S.Ct.* 2035. Finally, responding to the mall's claim that the California ruling essentially forced it to use its property to further the speaker's interests, the Court observed that the mall had chosen to invite the public, could easily disavow the message, and that, further, since the state government was not requiring that any particular message be conveyed, there was no danger of government discrimination. *Id.* at 86–89, 100 *S.Ct.* 2035.

## C.

As in California, free speech is protected in New Jersey by the State Constitution, as well as the Federal Constitution. Article 1, paragraph 6, of the New Jersey Constitution provides:

Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right. No law shall be passed to restrain or abridge the liberty of speech or of the press. In all prosecutions or indictments for libel, the truth may be given in evidence to the jury; and if it shall appear to the jury that the matter charged as libelous is true, and was published with good motives and for justifiable ends, the party shall be acquitted; and the jury shall have the right to determine the law and the fact.

[*N.J. Const.* art. 1, ¶ 6.]

In addition, article 1, paragraph 18 of the New Jersey Constitution provides: "The People have the right freely to assemble together, to consult for the common good, to make known their opinions to their representatives, and to petition for redress of grievances." *N.J. Const.* art. 1, ¶ 18. Although the federal constitutional right to free speech protects against unreasonably restrictive or oppressive conduct on the part of government entities, the right to free speech under the New Jersey Constitution also guards against unreasonably restrictive or oppressive conduct of private parties "that have otherwise assumed a constitutional obligation not to abridge the individual exercise of such freedoms because of the public use of their property." *State v. Schmid,* 84 *N.J.* 535, 560, 423 *A.*2d 615 (1980), *appeal dismissed sub. nom. Princeton University v. Schmid,* 455 *U.S.* 100, 102 *S.Ct.* 867, 70 *L.Ed.*2d 855 (1982).[8]

---

[8] Traditional constitutional doctrine defines three types of governmental forums for the conduct of expressive activities. (Latin scholars may object to the plural of forum but this usage has gained acceptance.) *Cornelius v. NAACP Legal Defense & Educational Fund, Inc.,* 473 *U.S.* 788, 802 105 *S.Ct.* 3439, 3449, 87 *L.Ed.*2d 567, 580 (1985). A "traditional public forum" has as its principal purpose the free exchange of ideas. *Marilyn Manson Inc. v. New Jersey Sports & Exposition Authority,* 971 *F.Supp.* 875, 884 (D.N.J.1997). A "designated public forum" is created where the government intentionally opens public property that is not a traditional public forum for use by the public as a place of expressive conduct. *Perry Education Ass'n v. Perry Local Educators' Ass'n,* 460 *U.S.* 37, 46, 103 *S.Ct.* 948, 955, 74 *L.Ed.*2d 794, 805 (1983). Finally, a "non-public forum" is

Similarly, in *State v. Shack*, 58 *N.J.* 297, 277 *A.*2d 369 (1971), the Court had held that although an employer of migrant farm workers "may reasonably require" those visiting his employees to identify themselves, "the employer may not deny the worker his privacy or interfere with his opportunity to live with dignity and to enjoy associations customary among our citizens." *Id.* at 308, 277 *A.*2d 369. The Court reversed the trespass convictions of an attorney and a social services worker who had entered the owner's property to assist farm workers there.

In *Coalition, supra,* the Court first addressed the question of whether the New Jersey Constitution's guarantee of freedom of speech permitted persons or groups to distribute leaflets at a group of suburban shopping malls. The Court declined to follow cases that had found no general right to freedom of speech in privately owned shopping centers. *Coalition, supra,* 138 *N.J.* at 349–352, 650 *A.*2d 757. Writing for the Court, Chief Justice Wilentz recognized that "[a]lthough the ultimate purpose of these shopping centers is commercial, their normal use is all-embracing, almost without limit, projecting a community image, serving as their own communities, encompassing practically all aspects of a downtown business district, including expressive uses and community events." *Id.* at 333, 650 *A.*2d 757. The Court asserted that these shopping centers have "significantly displaced downtown business districts as the gathering point of citizens." *Id.* at 344, 650 *A.*2d 757. Chief Justice Wilentz concluded, "[t]hus, malls are where the people can be found today." *Id.* at 345, 650 *A.*2d 757.

The *Coalition* Court recalled that in *Schmid, supra,* 84 *N.J.* at 563, 423 *A.*2d 615, the standard for balancing private property interests and expressive activities must take into account:

(1) the nature, purposes, and primary use of such private property, generally, its "normal" use, (2) the extent and nature of the public's invitation to use that property, and (3) the purpose of the expressional activity undertaken upon such property in relation to both the private and public use of the property.

[*Id.* at 354, 650 *A.*2d 757]

---

a publicly owned or operated venue that does not serve as a forum for public communication. *Marilyn Manson, supra,* 971 *F.Supp.* at 885.

The Court stated that this analysis "must be applied to ascertain whether in a given case owners of private property may be required to permit, subject to suitable restrictions, the reasonable exercise by individuals of the constitutional freedoms of speech and assembly." *Ibid.*

Applying the first two parts of that test, the *Coalition* Court stated:

> The regional and community shopping centers have achieved their goal: *they have become today's downtown and to some extent their own community; their invitation has brought everyone there for all purposes.* Those purposes in fact—regardless of their clear subjective profit motive—go far beyond buying goods; they include not only expressive uses but so many different uses without any commonality other than the mix of uses that define a community, and in terms of the centers' motivation, almost anything that will bring people to the centers. This is the new, the improved, the more attractive downtown business district—the new community—and no use is more closely associated with the old downtown than leafleting. Defendants have taken that old downtown away from its former home and moved all of it, except free speech, to the suburbs. *In a country where free speech found its home in the downtown business district, these centers can no more avoid speech than a playground avoid children, a library its readers, or a park its strollers.*

> [*Id.* at 360–61, 650 A.2d 757 (emphasis added).]

In applying the third part of this test, the Court added:

> These centers have full power to minimize whatever slight discordance might otherwise exist; full power to adopt rules and regulations concerning the time, place, and manner of such leafleting, regulations that will assure beyond question that the leafleting does not interfere with the shopping center's business while at the same time preserving the effectiveness of plaintiff's exercise of their constitutional right.

> [*Id.* at 362, 650 A.2d 757]

The *Coalition* Court decided the case not only on the basis of the three-pronged test in *Schmid,* but also on a more general balancing of expressional rights and private property rights. On one side, the Court weighed private property owners' interest in controlling and limiting activities on their property in light of the uses permitted and invited on the property. *Id.* at 363, 650 A.2d 757. The Court recognized that

> [t]he private property owners in this case, the operators of regional and community shopping centers, have intentionally transformed their property into a public

square or market, a public gathering place, a downtown business district, a community ... The sliding scale cannot slide any farther in the direction of public use and diminished private property interests.

[*Ibid.*]

On the other side of the balance, the Court weighed the plaintiff's free speech interest as "the most substantial in our constitutional scheme." *Ibid.* The Court concluded that any interference with the shopping mall's rights would be "negligible" and that the risk of damaging the mission of these shopping mall's was "practically non-existent." *Id.* at 364, 650 *A.*2d 757. Recalling *Shack, supra,* 58 *N.J.* at 306, 277 *A.*2d 369, the Court stated that "in necessitous circumstances, private property rights must yield to societal interests and needs, that there must be an 'accommodation between the right of the owner and the interests of the general public.'" *Id.* at 365, 650 *A.*2d 757. Therefore, the Court ruled that "where private ownership of property that is the functional counterpart of the downtown business district has effectively monopolized significant opportunities for speech, the owners cannot eradicate those opportunities by prohibiting it." *Id.* at 366, 650 *A.*2d 757.

Because the New Jersey's Constitution's free speech provision is an affirmative right, broader than practically all others in the nation, the Court held that "if the people have left for the shopping centers, our constitutional right includes the right to go there too, to follow them, and to talk to them." *Id.* at 369, 650 *A.*2d 757.

The *Coalition* Court limited its holding "to leafletting and associated speech in support of, or in opposition to, causes, candidates, and parties—political and societal free speech." *Id.* at 374, 650 *A.*2d 757. This limited free speech right "does not include bullhorns, megaphones, or even a soapbox; it does not include placards, pickets, parades, and demonstrations; it does not include anything other than normal speech and then only such as is necessary to the effectiveness of the leafletting." *Id.* at 376–77, 650 *A.*2d 757. The Court concluded: "The centers' power to impose regulations concerning the time, place, and manner of exercising the right of free speech is extremely broad.... Cer-

tainly no individual or group will be entitled to be present any more often than is necessary to convey the message." *Id.* at 377–78, 650 *A*.2d 757.

### III.

### What Standard Should Govern the Reasonableness of a Mall's Regulations of Time, Place, and Manner of Expressive Activities?

#### A.

We agree with the Appellate Division that because the *Coalition* Court described the mall owner's authority as "extremely broad," the narrowly tailored standard does not appear to be the appropriate standard. That standard traditionally applies in circumstances in which First Amendment privileges in a public forum have been circumscribed by the imposition of government regulations of the time, place or manner of speech. *Police Department of the City of Chicago v. Mosley,* 408 *U.S.* 92, 92 *S.Ct.* 2286, 33 *L.Ed.*2d 212 (1972); *Kovacs v. Cooper,* 336 *U.S.* 77, 69 *S.Ct.* 448, 93 *L.Ed.* 513 (1949); *Cox v. New Hampshire,* 312 *U.S.* 569, 61 *S.Ct.* 762, 85 *L.Ed.* 1049 (1941). Such restraints on speech must further a substantial governmental interest that has no relation to the content of the First Amendment expressions involved, *Mosley, supra,* 408 *U.S.* at 98, 92 *S.Ct.* 2286, and the regulations must be precisely tailored and present standards capable of objective application in order to avoid giving overbroad discretion to the officials charged with their implementation. *Niemotko v. Maryland,* 340 *U.S.* 268, 71 *S.Ct.* 325, 95 *L.Ed.* 267 (1951). We have used that standard when government (exercising injunctive power) restricts speech in traditional public forums to protect private property interests. *See Murray v. Lawson,* 138 *N.J.* 206, 649 *A*.2d 1253 (1994). In that case we came to the question whether the specific restrictions imposed by the court were narrowly tailored to serve the government's interest in protection of residential privacy.

This case presents the opposite balance. It involves governmental regulation of *private* property to enable the exercise of free speech rights. The narrowly tailored standard does not appear to fit.

### B.

■ We disagree, however, that the business judgment rule is the proper standard. Use of that standard evokes a familiar memory. In 1952, Charles Wilson, a former chief executive officer of General Motors who served as a member of President Eisenhower's Cabinet, remarked of business judgment that "[w]hat is good for the country is good for General Motors, and what's good for General Motors is good for the country." *U.S. v. Dethlefs*, 123 *F*.3d 39, 45 n. 5 (1st Cir.1997). We are not so certain that what is good for mall owners is good for the country, or, in this case, good for the citizens of New Jersey who seek to exercise their free speech rights. The *amicus* brief of the International Council of Shopping Centers has recognized as much and not urged that we adopt the business judgment rule as the standard to measure restraints on free speech by a mall operator.

■■ The business judgment rule has its roots in corporate law as a means of shielding internal business decisions from second-guessing by the courts. *Courts at Beachgate v. Bird*, 226 *N.J.Super.* 631, 641, 545 *A*.2d 243 (Ch.Div.1988). Under the rule, when business judgments are made in good faith based on reasonable business knowledge, the decision makers are immune from liability from actions brought by others who have an interest in the business entity. *Sarner v. Sarner*, 62 *N.J.Super.* 41, 60, 162 *A*.2d 117 (App.Div.1960). The business judgment rule generally asks (1) whether the actions were authorized by statute or by charter, and if so, (2) whether the action is fraudulent, self-dealing or unconscionable. *Thanasoulis v. Winston Towers 200 Ass'n, Inc.*, 110 *N.J.* 650, 666, 542 *A*.2d 900 (1988) (Garibaldi, J. dissenting); *Siller v. Hartz Mountain Assoc.*, 93 *N.J.* 370, 382, 461 *A*.2d

568, *cert. denied,* 464 *U.S.* 961, 104 *S.Ct.* 395, 78 *L.Ed.*2d 337 (1983).

The business judgment rule has limited relevance in this context. The Green Party is not involved in business dealings with the Mall, nor is it seeking redress of rights owing to it as a consequence of share ownership. Instead, the Green Party seeks to enforce a constitutionally guaranteed right to distribute literature and collect signatures in a shopping mall.

The relationship between a board of directors and shareholders is simply not relevant here. Once a business entity has concerns outside its doors it must contend with the needs and rights of all citizens. *Coalition* held that there are certain rights that citizens of New Jersey enjoy that must be protected against encroachment, whether that encroachment comes from the public or private sector. *Coalition, supra,* 138 *N.J.* at 363–64, 650 *A.*2d 757. The business judgment rule cannot be used to determine the reasonableness of time, place, and manner regulations of free speech in New Jersey's new "downtown business districts." *Id.* at 335, 650 *A.*2d 757.

## C.

Rather, we believe that the test to be applied is to be derived from the principles of *Coalition* that relied not only on the three-prong test in *Schmid,* but also on a general balancing of expressional rights and private property interests. The Court recognized that

[a]s private property becomes, on a sliding scale, committed either more or less to public use and enjoyment, there is actuated, in effect, a counterbalancing between expressional and property rights.

[T]he more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it.

[*Id.* at 363, 650 *A.*2d 757 (citations omitted).]

New Jersey has generally avoided classifying cases into different tiers for purposes of constitutional analysis. Justice Clifford once remarked that such elaborate analytical structures have a

tendency to create "a veil of tiers which shrouds [the] essential issue." *Matthews v. Atlantic City*, 84 *N.J.* 153, 175, 417 *A.*2d 1011 (1980) (Clifford, J., dissenting). Rather than to slot cases into tiers of strict scrutiny or narrow tailoring, we have attempted in constitutional analysis to balance the competing interests, giving proper weight to the constitutional values. Thus, in balancing the interests of abortion protesters to picket with the private property rights of physicians to residential privacy, we sought to protect the constitutional rights of each. *Murray, supra*, 138 *N.J.* at 232, 649 *A.*2d·1253. Here, we must also balance the rights of citizens to speak and assemble freely with the private property rights of mall owners.

In striking this balance, we must consider the nature of the affected right, the extent to which the mall's restriction intrudes upon it, and the mall's need for the restriction. *Greenberg v. Kimmelman*, 99 *N.J.* 552, 494 *A.*2d 294 (1985) (applying similar balancing test in context of equal protection and due process claims involving employment rights). The more important the constitutional right sought to be exercised, the greater the mall's need must be to justify interference with the exercise of that right. *Shack, supra*, 58 *N.J.* at 307, 277 *A.*2d 369 (discussing needs of migrant workers to be informed of their rights as outweighing private property interests of employer).

Although the *Coalition* Court declined to rule on the regulations then at issue, it provided evidence that such rules were to be tested by a standard similar to that used in other forum cases involving public space. The Court stated:

> It is the extent of the restriction, and the circumstances of the restriction that are critical, not the identity of the party restricting free speech. Were the government ever to attempt to prohibit free speech in the downtown business district, without doubt our Constitution would prohibit it, and in New Jersey when private entities do the same thing at these centers, our Constitution prohibits that too.
>
> [*Coalition, supra*, 138 *N.J.* at 369, 650 *A.*2d 757.]

The "broad authority" of which we spoke in *Coalition* is designed to ensure that time, place and manner regulation should minimize any interference with the mall's commercial functions without

denying the counterbalancing interest of leafleteers in expressive speech. *Id.* at 334, 364, 650 *A.2d* 757. The means chosen by the mall therefore must be designed to achieve the mall's legitimate purposes while preserving the leafleteer's expressive rights.

## IV.

In considering the weight of the Green Party's expressional rights, attention must be paid to the nature of the rights involved. Historically, centers of commerce have been meeting places for those who wish to speak, write, or exchange ideas. "In the Athenian Agora and the Roman Forum, on the London streets and colonial village greens, the public ways and gathering places, men [and today we would add women] learned the strength and wisdom of free discussion." *Police Commissioner of Baltimore City v. Siegel Enterprises, Inc.*, 223 *Md.* 110, 128, 162 *A.2d* 727 (1960).

There is a strong correlation between a free market in goods and a free market in ideas.

[Our] description of the theory of freedom of speech is based on an analogy to the economic market. Indeed, the dominant metaphor for "freedom of the press" throughout most of this century has been the "marketplace of ideas." The metaphor is based on the assumption that "the truth" will always win in a free and open encounter with falsehood. It is also based on a classic model of freedom of speech built upon the image of "soapbox orators" or individual pamphleteers who tried to reach their audiences.

[Alberto Bernabe Riefkohl, *Freedom of the Press and the Business of Journalism: The Myth of Democratic Competition in the Marketplace of Ideas*, 67 *Rev. Jur. U.P.R.* 447 (1998) (footnotes omitted).]

We would have hoped that mall owners would sense the connection between the colonial pamphleteers who secured our liberties and the pamphleteers who today seek access to the new forums of commerce. At the same time it is encouraging that the exchange of discordant views perpetuates the classical model of freedom that we pursue.

In this case, we are concerned with the right of persons to hand out fliers and solicit signatures in support of a candidate's nomination to public office. The Supreme Judicial Court of Massachu-

setts has described the paramount importance of this expressive activity:

> Ballot access is of fundamental importance in our form of government because through the ballot the people can control their government.... The difference between free speech and ... rights to free elections and to be a candidate equally with others is not purely theoretical. Ideas and views can be transmitted through the press, by door-to-door distributions, or through the mail without personal contact. On the other hand, a person needing signatures for ballot access requires personal contact with voters. He or she cannot reasonably obtain them in any other way. Reasonable access to the public is essential in ballot access matters.
> [*Batchelder v. Allied Stores International, Inc.*, 388 *Mass.* 83, 92, 445 *N.E.*2d 590 (1983) (citations omitted).]

Throughout much of New Jersey today there is no place to go, other than shopping centers and regional malls, if one is to have an opportunity to meet face-to-face with large groups of people in order to interest them in an issue by handing them a leaflet or asking them to sign a petition. Except for those commercial centers, the public common has largely ceased to exist. Most businesses in the state are conducted in facilities surrounded by parking lots far from the public streets.

Leafletting continues to be, as it has for generations, one of the few effective means of actually meeting a large number of fellow citizens. Because leaflets can be produced easily and inexpensively by almost anyone, they have been a favored means of such personal communication. A leafleteer with only a few dollars and a few hours can reach hundreds of people in a community if that leafleteer stands where most people are located. The Internet, cable television, and newer forms of media are of no help in this process. Leafletting also enables an organization to respond quickly to current events and provides a personal message that the leafleteer stands for the cause.

In addition, a leafleteer is likely to be required to engage in leafletting more than once a year, either because of a need to reach more people or because of the simple facts of political life, such that a candidate must not only seek public support to get on the ballot but must also seek votes when the election is held, and that issues change with time and events. Leafletting in heavily

visited shopping areas therefore has a very high value in our system of political discourse. Putting too high a price on the exercise of that freedom may destroy it.

In a long series of cases, the Supreme Court has held that governmental fees imposed as a condition of speech, are constitutionally suspect. In *Forsyth County, Ga. v. Nationalist Movement*, 505 *U.S.* 123, 112 *S.Ct.* 2395, 120 *L.Ed.*2d 101 (1992), the Court ruled that because a county ordinance imposing a fee for a parade permit provided no articulated standards or objective factors to guide the administrators' decision, the requirement was invalid. The late Professor Eric Neisser summarized these standards in his article, *Charging for Free Speech: User Fees and Insurance in the Marketplace of Ideas*, 74 *Geo. L.J.* 257 (1985).

In *H–CHH Assocs. v. Citizens for Representative Gov't*, 193 *Cal.App.*3d 1193, 238 *Cal.Rptr.* 841, *review denied* (Oct. 29, 1987), *cert. denied*, 485 *U.S.* 971, 108 *S.Ct.* 1248, 99 *L.Ed.*2d 446 (1988), the California Court of Appeals considered a rule that conferred upon mall management the discretion to determine whether proposed political petitioning created a risk of injury or damage to person or property that required special insurance protection, which the applicant must then provide. The panel stated that " '[r]isk of injury' is yet another general and subjective standard vulnerable to arbitrary or content related determination. It is closely akin in value as a standard to 'danger to public'; in a word, it is fatally defective." *Id.* at 857 (citing *Hague v. CIO*, 307 *U.S.* 496, 516, 59 *S.Ct.* 954, 964, 83 *L.Ed.* 1423 (1939)). The court concluded:

> Neither is there any indication as to how management is to determine whether the risk warrants special insurance protection. In its totality, [the mall's insurance requirement] is unconstitutionally overbroad.
>
> Once again it is possible for plaintiffs to craft the necessary objective criteria, *i.e.:* (1) Whether there is a prior history of injury to persons or property when this group engages in expressive activity; (2) whether there is a prior history of injury to persons or property when similar groups engage in expressive activity; (3) the historical scope of the risk and whether it exceeds the minimal or inconsequential; (4) whether the risk can be lessened or eliminated by adjusting the time, date,

place or planned manner of expression; and (5) if so, whether the applicant is willing to make such adjustments....

[*Id.* at 857–58.]

These requirements for information, if met, would allow us to consider whether any legitimate business interests of the mall have been infringed or threatened by the expressive political activity. In *Union of Needletrades, Indus. & Textile Employees v. Superior Court*, 56 *Cal.App.*4th 996, 65 *Cal.Rptr.*2d 838 (1997), a different panel of the court sustained a requirement that an applicant submit information that would enable objective determination of whether such risks would be presented.

In weighing the harm that mall owners may suffer, we must consider the nature and extent of the risk posed by leafleteers and pamphleteers. The United States Supreme Court and the California courts have suggested, and we agree, that the analysis should focus on objective factors. In this case, there has been no prior history of injury when this or any related group engaged in expressive activity or demonstration of the actual cost of the risk. (Of course, an organization with a demonstrated history of provoking violent reaction might pose special problems that we do not attempt to resolve here.)

As evidence of the risk that may be posed by leafleteers, the Mall provided a list of claims made against it. The majority of those were from "slip and fall" cases and falling shop racks. The Green Party sought to show that the vast majority of those injuries had occurred when people were working with liquids, operating machinery, or displaying their wares on movable racks. Simply put, it contended that offering a piece of paper to a passing customer does not pose a similar danger to those found in slip and fall cases.

In fact, the Mall's insurance expert explained that the claims filed against the Mall were below average in the industry. As noted, plaintiff insists that the incidents involved claims made, not payments made by the Mall, or any other party. Concerning the scope of the risk, as we understand the record, the Mall has a

$1,250,000 per occurrence deductible. That means that the Mall is prepared to accept, as part of its general invitation to the thousands of people per year who come on the mall premises, the risk that they might, through their activities, create a dangerous condition of property affecting others. (Plaintiff's counsel estimated the number at as many as one million people per year). The question is: what additional risk to the mall owners is created by the occasional presence of the signature gatherers?

At oral argument, we explored with counsel the suggestion that a single event liability insurance policy would be less expensive than a yearly policy. The premium quoted was $250. We understand that such a premium, as with most types of insurance policies, reflects expected losses plus expenses. There are certain fixed transactional expenses common to all policies, whether coverage exists for a day, several days, or a year. Fixed transactional expenses may include the costs of the administrative process in taking an application for coverage, and compensation for the agent taking the application, if not a full commission paid to the agent. The costs of underwriting to assess the application for coverage must also be included, as well as the necessary expenses associated with policy issuance and providing evidence of coverage. All these expenses are included as part of the premium amount quoted for either a single event liability policy or liability coverage for a full year.

In the case of a single event liability policy, the transactional expense factors represent a higher portion of total premium. Ordinarily these transactional expenses would be spread over a longer period of coverage, such as a year. With single event liability coverage however, the transactional expenses for coverage for a single day or a single event over several days may appear to be disproportional compared to a policy issued for a full year, but that is inevitable in the process. Thus, if the leafleteers were to wish to exercise their rights on more than one occasion (*e.g.*, at primaries and at general elections), the single event liability policy would provide no real savings. In addition, because leafleteers

often distribute their literature in response to changing current events, the costs associated with a single event liability policy could quickly out-pace those of a yearly policy.

## V.

Although we do not agree with *amicus,* New Jersey Peace Action, that plaintiffs have an absolute right to enter upon and conduct expressive activities in the Mall, we do believe that its analysis leads to an understanding of the real issues here. In *Uston v. Resorts International Hotel, Inc.,* 89 *N.J.* 163, 445 *A.*2d 370 (1982), Justice Pashman eloquently described the evolution of New Jersey's doctrine concerning the common law right of access to places of public accommodation. He observed that although at one time an absolute right of preclusion prevailed in the State, it hardly bore mention that our common law had evolved in the intervening seventy years. *Id.* at 172, 445 *A.*2d 370. Of far greater importance, he noted, were the decisions of this Court recognizing that "the more private property is devoted to public use, the more it must accommodate the rights which inhere in individual members of the general public who use that property." *Ibid.* (quoting *Schmid, supra,* 84 *N.J.* at 535, 423 *A.*2d 615). Justice Pashman stated: "[p]roperty owners have no legitimate interest in unreasonably excluding particular members of the public when they open their premises for public use." *Id.* at 173, 445 *A.*2d 370. Among the considerations that justified the exclusion of one such as Uston from casinos was the unfair economic advantage he possessed by virtue of not playing by the usual rules of chance. That would cost the casinos money. The analogous question in this case is whether these leafletting activities would cost the mall owners money.

In this respect, we must ask what is the price that a mall owner must pay to forego its right of exclusion. Subject to concern that such fees might become constitutionally invalid if the aggregate costs from obtaining riders at numerous malls resulted in a prohibition of expressive activities, plaintiffs expressed willingness

to pay a fair fee for any burden that they actually impose. *See Moyant v. Borough of Paramus*, 30 *N.J.* 528, 154 *A.*2d 9 (1959) (holding $25 canvassing license as excessive and invalid under state and federal law). At oral argument, Court and counsel discussed the possibility of the Mall owner's purchase of a rider or special endorsement to its existing policy specifically to cover potential liability from expressive activities. Counsel explained that such was not realistic or possible because the Mall's existing insurance program is premised on the self-insured retention of $1,250,000 per occurrence. We are not certain that that fact forecloses any future analysis of pricing out the real economic cost of a rider.

A self-insured retention or insurance deductible is actually a form of risk retention. It expresses the risk that a business is willing to bear rather than to pay the premiums to transfer the risk to an insurance company. To understand fully the risk posed by the presence of leafleteers or signature gatherers, the proper analysis would be to determine: (1) what would be the cost of coverage if the mall had purchased first dollar insurance coverage for all of the liability to which it was exposed by the actions of the many thousands of persons who visit the mall each day, instead of retaining the risk; (2) what would the additional premium cost to cover the leafleteers and signature gatherers on those occasions when they exercise their expressive rights; and (3) what would be the pro rata share of the leafleteers and signature gatherers?

The actuarial analysis for this type of rate setting is familiar. Expressive activities take many forms. It seems somewhat unfair to charge leafleteers for occasionally exercising expressive rights when skylarking teenagers, who accept the general invitation of the Mall and pursue expressive activities that would appear to pose a greater risk, are not asked to pay anything for that privilege.[9] Still, the Green Party displays no reluctance to bear a

---

[9] At oral argument, counsel for the Mall expressed mild surprise when it was suggested that many young people go to malls with no purpose to shop.

fair share of an experience rated premium, a premium that would assess the actuarial risk posed by the leafleteers in relation to the broad risk that the Mall takes in its general invitation to the public.

## VI.

To sum up, the request of the Mall for a $1,000,000 insurance policy is a business judgment, but it is a subjective judgment. It lacks the objective bases necessary to sustain management's decision. In *Coalition, supra,* the Court granted malls "extremely broad powers" to promulgate reasonable regulations concerning the time, place, and manner of leafletting. *Id.* at 362, 650 *A.*2d 757. The Court did not intend that those regulations would prevent the exercise of expressive activities.

We would not foreclose that a better developed record, that is, an objective showing of the real economic costs of occasional activities of leafleteers, would persuade us that the requested expressional activities impose an unfair economic burden on mall owners, and that leafleteers could be required to pay a fairly allocated fee objectively related to the risk they might create. This record does not disclose such a risk. The Mall's proofs on this record fall far short of demonstrating that the insurance requirements posed by the Mall reasonably are required to

---

Experience in other jurisdictions, however, shows how much the malls have replaced the street corners of days past. The "Mall of America" in Minnesota even sought to impose curfews for its younger patrons, as would the town fathers of yesteryear. Alysa B. Freeman, Comment, *Go to the Mall with My Parents? A Constitutional Analysis of the Mall of America's Juvenile Curfew,* 102 *Dick. L.Rev.* 481 (1998) ("Like their counterparts around the country, Minnesota teens regularly go to the Mall on weekend evenings. Estimates hold that between two and three thousand teenagers frequent the Mall of America on both Friday and Saturday evenings. Many, if not most, go to the Mall because there is little else to do in the community on the weekend evenings and because the Mall is a good place to see and be seen. Due to its size, the Mall is thus faced with a proportionately larger group of teen visitors than are other malls across the nation.").

achieve legitimate business objectives while preserving the leafle-teers expressive rights. Because of that deficiency in its proofs, we have no alternative but to invalidate the conditions it has imposed. The hold harmless agreement is linked to the insurance requirement. It contains language similar to that required by business tenants, referring to "invitees." A hold harmless agree-ment related to the actual activities of the leafleteers that cause liability to be created would not be objectionable. Finally, we understand that an accommodation between the parties has been reached, or may be reached concerning the number of days when leafletting may be requested. Because of the primary and general election cycles, more than one day per year is reasonably required to exercise the expressive rights requested.

The judgment of the Appellate Division is reversed, and the judgment of the Chancery Division, as modified, is reinstated.

*Reversal and reinstatement, as modified*—Chief Justice PORITZ and Justices O'HERN, STEIN, COLEMAN, LONG, VERNIERO and LaVECCHIA—7.

*Opposed*—None.