**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0795-23
A-1665-23

MELISSA SCHWARTZ and
STEVEN SCHWARTZ,

      Plaintiffs-Appellants,

v.

MICHAEL KOPELMAN, ESQ.,
and CAROL RACHESKY,
a/k/a CAROL REINFELD,
a/k/a CAROL WOLFE,

      Defendants,

and

1266 APARTMENT CORP.,

      Defendant-Respondent.

_____

Argued March 12, 2026 – Decided May 21, 2026

Before Judges Marczyk, Bishop-Thompson and Puglisi.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-0128-20.

Thomas A. Gentile argued the cause for appellants (Wilson Elser Moskowitz Edelman & Dicker LLP, attorneys; Thomas A. Gentile, on the briefs).

Matthew Z. Earle argued the cause for respondent 1266 Apartment Corp. (Kates Nussman Ellis Earle & Landolfi LLP, attorneys; Cara Landolfi and Matthew Z. Earle, on the brief).

PER CURIAM

This consolidated appeal involves a dispute between defendant 1266 Apartment Corp. (Corporation) and two shareholders, plaintiffs Melissa and Steven Schwartz.[1] Plaintiffs appeal from the trial court's November 3, 2023 order, which modified previous orders dated August 23, 2023, and September 26, 2023, granting the Corporation summary judgment on its counterclaims against plaintiffs, terminating their lease, ejecting them from their apartment, terminating their shares of the unit, and allowing the Corporation to sell their shares and utilize the sale proceeds. Plaintiffs also challenge the court's award of attorneys' fees. Following our review of the record and the applicable legal principles, we affirm.

---

[1] Because plaintiffs share a last name, we will refer to them by their first names when referencing them individually. We intend no disrespect.

A-0795-23

## I.

The Corporation is a residential housing cooperative association that owns and operates six buildings containing 1,266 units. Plaintiffs have resided in apartment 2908, located in building six, for approximately twenty-three years.

Plaintiffs are shareholders of the Corporation. The Corporation is governed by its bylaws, and pursuant to those bylaws, the Board of Directors (Board) manages and controls the Corporation. The bylaws also authorize the Board to adopt and amend rules for the "health, safety[,] and convenience of the shareholders and any other occupants" that would be binding upon all the Corporation's residents.

These rules, known as House Rules and Regulations (House Rules), include a code of conduct applicable to the residents, providing, in pertinent part: "[p]ublic halls must not be obstructed or used for any purpose other than access to apartments"; and "[n]o one shall be permitted to use more than two . . . washers or two . . . dryers at one time." The House Rules also state: "[m]anagement, after proper written notice, shall be permitted entry to any apartment at a reasonable hour to determine whether there has been damage to or from the resident's apartment." The House Rules further provide the Corporation was responsible for the maintenance of all common areas and

A-0795-23

building exteriors, whereas shareholders were responsible for repairs to their apartments, including repairs to "[f]loors which . . . are damaged due to . . . leaks . . . through windows or doors in the apartment[,] . . . from any appliance in the apartment, or . . . [from] faulty plumbing inside the apartment."

Shareholders of the Corporation were also bound by their respective proprietary lease. By signing the lease agreement, shareholders acknowledged their lease was subject to the House Rules, and a breach of the House Rules constituted a default under the lease. The lease also reaffirmed the respective repair obligations of the parties as set forth in the House Rules.

Additionally, the lease contained various rights and conditions applicable to the residents. Paragraph 18(b) of the lease, for example, stated, "[t]he [l]essee shall not permit or suffer any unreasonable noises or anything which interferes with the rights of other lessees or unreasonably annoys them or obstructs the public halls or stairways."

The lease also specified the occurrence of certain events, as stated in paragraphs 31(a) through (i), authorized the Corporation to terminate a shareholder's lease, provided the Corporation gave the resident five days' notice. One of those events, stated in paragraph 31(e), included default under the lease—other than the failure to pay rent—for thirty days, after written notice

4

from the Corporation.  Paragraph 31(f), which addressed objectionable conduct, provided:

> If at any time the [Corporation] determines, upon the affirmative vote of two-thirds of its then Board . . . at a meeting duly called for that purpose, that because of objectionable conduct on the part of the [l]essee or of a person dwelling or visiting in the apartment, repeated after written notice from the [Corporation], the tenancy of the [l]essee is undesirable (it being understood, without limiting the generality of the foregoing, that to repeatedly violate or disregard the House Rules attached hereto or hereafter in accordance with the provisions of this lease, or to permit or tolerate a person of dissolute, loose[,] or immoral character to enter or remain in the [b]uilding or the apartment, shall be deemed to be objectionable conduct)[.]

As for the Corporation's rights, such as the right of entry into a resident's apartment, paragraph 25 explained:

> The [Corporation], its agents[,] and authorized workmen shall be permitted to visit, examine[,] or enter the apartment and any storage space assigned to [the l]essee at any reasonable hour of the day upon notice, or at any time and without notice in case of emergency, to make or facilitate repairs in any part of the [b]uilding . . . .

The lease further provided any notices or demands from either party to the other "shall be in writing and sent by registered mail, return receipt requested," and "[n]otices or demands shall be deemed given on the date when mailed." Paragraph 42 of the lease indicated, in the event of a breach or threatened breach

5

by a resident of any provision in the lease, the Corporation "shall have the right of injunction and the right to invoke any remedy at law or in equity."

Finally, paragraph 28 of the lease stated:

> If the [l]essee is at any time in default hereunder and the [Corporation] incurs any expense (whether paid or not) in performing acts which the [l]essee is required to perform, or in instituting any action or proceeding based on such default, or defending or asserting a counterclaim in any action or proceeding brought by the [l]essee, the expense thereof to the [Corporation], including reasonable attorneys' fees and disbursements, shall be paid by the [l]essee to the [Corporation], on demand, as additional rent.

Plaintiffs had a history of issues and altercations with the Corporation staff and its residents, which were documented by the Corporation. Melissa, for example, was involved in numerous confrontations with other residents and housekeepers in the laundry room, had incidents with the security staff, and allegedly misused the storage room. She also had confrontations with the doormen at the Corporation. Both residents and staff filed police reports in response to her behavior. The Corporation directed Melissa, on several

6

occasions, to cease the objectionable conduct, and it also sent her numerous notices to cure.[2]

On January 8, 2020, plaintiffs filed a three-count complaint against Michael Kopelman, the Corporation, and Carol Rachesky. In count one, plaintiffs asserted claims of negligence, battery, and defamation against Kopelman, another shareholder of the Corporation, in connection with a September 4, 2018 incident where plaintiffs alleged Kopelman called Melissa a "c[**]t" and "violently struck and punched" Steven in the elevator and lobby of their building. In count two, plaintiffs asserted negligence and breach of contract by the Corporation, alleging it was "on notice" of Kopelman's harassment against them, yet it "failed to take any . . . affirmative action" to protect them. Lastly, in count three, plaintiffs alleged negligence and defamation against Racheksy, another shareholder of the Corporation, alleging she harassed, stalked, and defamed plaintiffs for years.[3]

---

[2] The record shows the Corporation sent plaintiffs notices to cure on: December 21, 2005; December 21, 2006; January 10, 2007; June 16, 2009; November 24, 2009; October 25, 2012; December 24, 2019; March 12, 2020; January 11, 2021; March 17, 2021; September 17, 2021; October 31, 2022; and December 15, 2022.

[3] It is not clear from the record how plaintiffs' claims against Kopelman and Rachesky were resolved. These claims are not part of this appeal.

The Corporation answered and counterclaimed. In its counterclaim, it asserted counts for injunctive relief, abatement of nuisance, breach of contract, and attorneys' fees. It alleged plaintiffs had "been engaged in an egregious pattern of aggressive verbal and physical confrontations with multiple different residents, shareholders, and employees of the Corporation," which violated the prohibition of engaging in "objectionable conduct" contained in plaintiffs' lease. The Corporation also sought an injunction prohibiting plaintiffs from engaging in further objectionable conduct.

On March 12, 2020, two months after this litigation commenced and prior to answering plaintiffs' complaint, the Corporation's counsel sent a notice to cure to plaintiffs' attorney via email and regular and certified mail. The notice stated its purpose was, in part, to place plaintiffs on notice "that they must cease engaging in . . . objectionable conduct." The letter stated the Corporation was "advised that [plaintiffs] ha[d] engaged in an egregious pattern of aggressive verbal and physical confrontations with many different residents of the building and employees of the Corporation." It noted repeated instances of plaintiffs calling the police about "incidents that [plaintiffs] appear to have instigated."

The notice to cure cited five specific instances of plaintiffs' conduct:

> 1.    On February 4, 2020[,] at approximately 1:30 [p.m.,] resident Joe Berger was doing laundry in the

building [six] laundry room and using one machine. When he returned to the laundry room, he found that [Melissa] had removed his laundry from the washing machine prior to its completion of the spin cycle. . . . Berger also noted that [Melissa] was using [five] washing machines even though the laundry room rules set a limit of the use of [two] washing machines at one time by a resident. . . . Berger advised her of same, and she responded that no one else was there. He pointed out that she had removed his clothes before the spin cycle [ended]. At that point, [Melissa] angrily lashed out at . . . Berger and said that he and his children were miserable people, and that . . . Berger was "attacking" her. She then went to get her husband while . . . Berger folded his clothes.

Video footage from the hallway adjacent to the laundry room shows that while . . . Berger carried his clothes out of the laundry room towards the elevator, [plaintiffs] emerged from the elevator and began angrily confronting . . . Berger. In particular, [Melissa] appeared to be screaming at . . . Berger while wildly gesticulating and pointing at him. While being subjected to [the] same, . . . Berger attempted to enter the elevator and leave, but [Melissa] physically blocked him from doing so. Eventually, [Melissa] moved, and . . . Berger got on the elevator. While the doors were closing[, Melissa] appeared to continue to yell at . . . Berger and angrily point at him. . . . Berger lodged a complaint with management.

2.    On January 25, 2020[,] [s]hareholder Pauline Zatz came to the laundry room to find that Melissa . . . had removed . . . Zatz's clothing from the washing machine that she was using. . . . Zatz told [Melissa] that she should not be touching other resident[s'] clothes when they were a few minutes late to remove them from the machine. [Melissa] became angry and accused . . .

A-0795-23

Zatz of "harassing" her. [Melissa] then called the doorman and demanded that he call the police. The doorman declined to call the police. . . . Zatz then put her clothes in a dryer and left. [Melissa] then called the police. The police visited . . . Zatz but took no action. . . . Zatz then called security to escort her to the laundry room to retrieve her clothes.

3. On January 12, 2020[,] resident Phyllis Pfeifer walked into the lobby of building [six] while Melissa . . . was sitting in a chair in the lobby. She did not look at [Melissa,] nor did she speak with her. . . . Pfeifer spoke with the doorman in the package room. Half an hour later[,] two people from security came to . . . Pfeifer's apartment and stated that [Melissa] claimed that . . . Pfeifer had harassed her. Subsequently, two police officers came to . . . Pfeifer's apartment after having received a call from [Melissa]. No police action was taken. . . . Pfeiffer lodged a complaint with management.

4. Carol [Rachesky] reported that on November 7, 2019[,] she attempted to enter an elevator in building [six] to find that [plaintiffs] were already on it. [Melissa] told her that she could not get on the elevator. . . . [Rachesky] said that, "I am coming on, if you want to get off[,] ok." According to . . . [Rachesky,] she began using her phone while Melissa . . . began screaming insults at her, calling her a b[****], and making fun of her appearance. Video evidence from the elevator camera shows . . . [Rachesky] looking at her phone while [Melissa] appears to scream and point at . . . [Rachesky]. At one point, [Melissa] lunged at . . . [Rachesky] and was restrained by her husband. . . . [Rachesky] further reported that on November 10, 2019[,] she again attempted to board an elevator but was blocked by [Melissa]. Fearing another confrontation, . . . [Rachesky] declined to enter the

10

elevator. . . . [Rachesky] lodged a complaint with management.

5. On August 22, 2019[,] resident Gerald N. Daffner reported that on August 13, 2019[,] he was returning to his apartment[,] which is adjacent to that of [plaintiffs']. He had a grocery cart. [Melissa] had left a luggage rack in the hallway[,] which blocked . . . Daffner from bringing his grocery cart into his apartment. He moved [Melissa]'s cart out of the way so that he could enter his apartment. This enraged [Melissa,] who began yelling and shoving the grocery cart into his body over and over, and attempted to tip over . . . Daffner's cart[,] and caused his mail to spill on the floor. . . . Daffner and his wife are both [eighty-five] years old. . . . Daffner lodged a complaint with management.

The notice advised plaintiffs the Board deemed their actions to constitute objectionable conduct in violation of paragraph 31(f) of the lease, and, if not cured within thirty days, the Board could vote to terminate their stock and lease. It further advised plaintiffs could cure their objectionable conduct if they ceased and desisted from having verbal and physical altercations with residents and staff members.

On April 29, 2020, plaintiffs' counsel advised the Corporation's counsel his clients were "working on a detailed factual response to . . . [the] March 12, 2020" notice, but he needed more time to respond. The record does not contain a further response to the March 12, 2020 notice. However, on April 17, 2020, plaintiffs' counsel sent a letter to the Corporation's counsel, complaining about

Daffner's conduct towards plaintiffs. In their subsequent opposition to the Corporation's motion for summary judgment, plaintiffs denied receiving the March 12, 2020, notice "as it was never sent to them personally or to their unit as prescribed by the proprietary lease."

On December 22, 2020, plaintiffs reported to their building's security they sustained a water leak in their dressing room closet. The Corporation staff reported to the apartment and observed "water had seeped in from underneath the wall," and the underlying floor tile had "buckled." According to a certification from Michael Walsh, the Corporation's director of facilities, the staff cleaned up the water and placed dehumidifiers in the apartment. Walsh also certified staff investigated plaintiffs' neighbor's apartment and initially believed the source of the leak was a neighbor's refrigerator. Accordingly, staff provided plaintiffs with that neighbor's insurance information. On December 28, 2020, Joe Sinisi, another staff member, emailed plaintiffs advising the Corporation's contractor would contact them that day to address the floor repairs and noting "[t]he origin of the leak came from a broken refrigerator water line which occurred in apartment # 2909."

However, according to Walsh, staff later moved the neighbor's refrigerator and discovered no evidence of water damage, and thus, "it was clear that was

A-0795-23

not the source of the leak."  Walsh also certified he reviewed the building plans and noted the neighbor's bathroom was adjacent to the location where plaintiffs' leak occurred.  The Corporation thereafter concluded it needed to conduct a water test, which involved running water in the neighbor's bathroom at the same time as another staff member observed plaintiffs' closet to determine whether any leaks were present, and if so, trace the source of the water infiltration.

On January 6, 2021, plaintiffs' attorney sent the Corporation's counsel a letter, stating plaintiffs were "suffering through a flood in their apartment" and demanding the Corporation "immediately determine and certify precisely where the water [wa]s emanating from."

The following day, the Corporation's counsel emailed plaintiffs' attorney, stating the Corporation needed to conduct a water test to determine the source of the leak.  The email noted plaintiffs' "cooperation in this assessment will be required[,] since access to their apartment will be necessary to determine if a leak is occurring."  That same day, plaintiffs' counsel responded via letter stating plaintiffs were "happy to provide access to their apartment," but given the COVID-19 pandemic, they needed staff to wear a face mask upon entry to the unit, confirm the staff member's temperature, and have the Corporation verify the staff member had a recent negative COVID-19 test.

13

On January 8, 2021, plaintiffs emailed Walsh asking him to "lay[] out [the] plan of action to resolve this flood issue" and inquiring about the water test. That same day, Walsh contacted plaintiffs asking whether they were available that afternoon to conduct the test. Also on January 8, the Corporation's counsel sent an email to plaintiff's counsel, stating "[t]he Corporation is unclear whether your clients are willing to provide access to perform the necessary tests" and noting plaintiffs had an obligation under the lease to provide access. The email further stated plaintiffs had "no basis . . . to attach any further terms and conditions regarding said access." In addition, the email noted plaintiffs had a telephone conversation with Walsh, which ended with plaintiffs calling him a "liar[]," and another conversation with Sinisi, in which plaintiffs called him a "liar[]" and a "piece of s[***]."

On January 11, plaintiffs' counsel responded to the January 8 email, stating it had been seventeen days since the flood in plaintiffs' apartment, and the Corporation still had not taken any action. Counsel further stated plaintiffs were amenable to the water test but only if certain conditions were met: (1) the names of all individuals who would access the apartment were provided; (2) a time frame for the duration of the test was provided; (3) a negative COVID-19 test result within the past seventy-two hours for each person going to the

14

apartment was required; (4) temperature checks were conducted before entry; and (5) each staff member wore a face mask and gloves. Additionally, plaintiffs' counsel demanded proof the Corporation had amended its bylaws and rules to adopt COVID-19 protocols.

The Corporation's counsel responded to plaintiffs' counsel the same day, reiterating the Corporation needed to conduct the water test to determine the source of the leak, and plaintiffs were in violation of the lease by refusing to provide access. Counsel agreed to provide plaintiffs with the names of all individuals who would enter the apartment, once the parties agreed on a date, as well as an estimated length of time for the test and agreed all staff would wear face masks and gloves. However, counsel stated the Corporation "has a legal duty to keep its employees' medical information confidential," and therefore, it could not provide plaintiffs with staff members' temperature information or the results of their COVID-19 tests. Nevertheless, counsel asserted the Corporation was complying with Executive Order 192[4] and appropriately monitoring employees for COVID-19 symptoms.

On January 22, 2021, plaintiffs' counsel responded via letter, denying plaintiffs were refusing access or in violation of the lease, but rather they were

---

[4] See Exec. Order No. 192 (Oct. 28, 2020), 52 N.J.R. 2079(a) (Dec. 7, 2020).

A-0795-23

requesting "reasonable conditions" in light of the COVID-19 pandemic and because plaintiffs were "older and ha[d] serious underlying health issues." Counsel further inquired as to what the water test would entail and what the Corporation's plan was to fix the leak if it determined the leak originated from the neighbor's bathroom.

The Corporation's counsel responded via letter dated January 27, reiterating staff would wear gloves and masks but again declining to provide the "employees' personal health information" and setting forth what the water test would entail. Regarding plaintiffs' concerns on how the Corporation would repair the leak, the Corporation's counsel stated it could not devise a plan until it determined the source of the leak.

On March 17, 2021, the Corporation's counsel sent plaintiffs an amended notice to cure. The letter stated the Corporation sent the notice directly to plaintiffs because they did not have an attorney representing them on the Corporation's counterclaim at the time.[5] Further, the notice stated its purpose was, in relevant part, to provide plaintiffs with an opportunity to cure their violation of the lease due to their failure to provide access to their apartment and

---

[5] Plaintiffs' prior attorney had moved to be relieved as counsel, which the court granted on February 24, 2021.

16

to place them on notice regarding additional objectionable conduct.

The notice set forth the parties' communications regarding the December 22, 2020 leak, stating, "[t]o date, you have continued to refuse to provide access and are in breach of the . . . [l]ease." The letter also stated despite the March 2020 notice, plaintiffs continued their objectionable conduct, citing plaintiffs calling Walsh a "liar" and Sinisi a "piece of shit." The letter further asserted that on June 16, 2020, plaintiffs "entered the security office and cursed out and insulted staff." Counsel advised plaintiffs the Corporation intended to move for injunctive relief seeking access to the apartment, and the Corporation reserved its right to terminate plaintiffs' stock and lease. On March 18, 2021, plaintiffs sent a letter to the court, confirming receipt of the March 17 notice.

On March 31, 2021, the Corporation moved for injunctive relief seeking "entry and access" to plaintiffs' apartment to investigate and repair the leak in the apartment. Due to the COVID-19 restrictions, the Corporation stated its employees and agents would wear face masks and maintain a distance of at least six feet from plaintiffs when they entered the apartment. On April 16, the trial court granted the Corporation's application and ordered plaintiffs to provide the Corporation access to their apartment on or before April 23. The order required the Corporation's staff to wear face masks and maintain at least six feet of

distance from plaintiffs and required the Corporation to provide plaintiffs with the names of the individuals who would enter the apartment. On April 19, the Corporation's counsel emailed plaintiffs' new attorney,[6] asking for dates and times when plaintiffs would make their apartment available for the water test. After receiving no response, counsel sent a follow-up email on April 22.

On April 23, plaintiffs' attorney responded plaintiffs were available on either May 6 or May 7. The Corporation's counsel subsequently advised it would conduct the water test on May 6. In addition, the Corporation's counsel stated plaintiffs recently reported "an additional minor discoloration on a part of their living room ceiling[,] which could be the result of a leak[,]" and the Corporation wanted to assess the ceiling issue on the same day it conducted the water test.

The Corporation's counsel emailed plaintiffs' attorney on May 3, asking to confirm the May 6 date for the water test. Plaintiffs' counsel responded on May 5, advising plaintiffs had communicated with Walsh and decided to address the living room ceiling issue first and resolve the leak on a later date.

On May 20, 2021, the Court entered a case management order, in which

---

[6] The docket reflects plaintiffs' new attorney entered an appearance on March 29, 2021.

A-0795-23

it again ordered plaintiffs' attorney to provide the Corporation's counsel, by end of day, with dates on which the Corporation could enter the apartment "to address the outstanding leak issue, per prior orders." That same day, the Corporation's counsel emailed plaintiffs' attorney, asking for the dates to inspect the apartment. The following day, the Corporation's counsel emailed plaintiffs' attorney again, noting no dates had been provided. The Corporation's counsel also noted staff advised him plaintiffs stated they would be away until mid-June and would therefore be unavailable to conduct the water test, which counsel stated was "not acceptable." A few hours later, the Corporation's counsel sent another email, advising plaintiffs' neighbor was available for the water test on either May 26 or May 27. Counsel followed up again on May 24, seeking a response.

Later on May 24, 2021, plaintiffs' attorney emailed the Corporation's counsel plaintiffs could provide access to the apartment on June 22 or June 24. The email also advised plaintiffs would be out of town and would not return until June 14. The Corporation's counsel responded on May 28, selecting June 22 as the date for the water test, with June 24 being a "back[-]up date."

On June 22, the Corporation's counsel emailed plaintiffs' attorney, advising plaintiffs had canceled the water test and told management they would

A-0795-23

be unavailable until after July 8. Plaintiffs' attorney responded on June 24, 2021, stating plaintiffs "had suddenly been offered a substantial business opportunity out of town" and had to leave "immediately."

Later that same day, management emailed a notice of a Board meeting to all shareholders. The notice indicated the Board would meet via Zoom on July 1, 2021, to vote to "terminate [the] stock and lease of particular shareholders and to authorize corporate counsel to send appropriate notices and take legal action." The Corporation's portal reflected it sent notice of the meeting via email to plaintiffs. In addition, the general manager of the Corporation testified staff also placed notice of the meeting in the common areas of each building.

The Board met on July 1, 2021, with the meeting minutes reflecting six directors were present and one absent. In addition, the Corporation's counsel was present, as well as the general manager and the assistant general manager. Howard Pearl, the Board's secretary, and Richard Ng, the Board's president, testified the Board authorized the Corporation's attorney to run the meeting. All six directors, satisfying the two-thirds majority required, ultimately voted in favor of terminating plaintiffs' stock and lease.

At his deposition, Pearl testified while he did not personally investigate the truthfulness of the allegations against plaintiffs, he had witnessed Melissa's

A-0795-23

"poor behavior" "on various occasions." Pearl also explained he voted in favor of the termination based on his personal knowledge, as well as the documents presented to the Board, including the security incidents and police reports.

Similarly, the Board president stated he reviewed security footage of the February 4, 2020 incident with Berger and the November 7, 2019 incident with Rachesky prior to the vote. Regarding the Board's decision, the president testified, "[w]hen the [B]oard observed the quanti[t]y of incidents, examples of objectionable behavior in the quantity that we observed, we made the business decision to terminate the stock and lease held by [plaintiffs]." Another Board member testified there was a "barrage of complaints" against plaintiffs, and the Board had "overwhelming evidence" justifying the termination of plaintiffs' stock and lease.

The Board issued a confidential resolution outlining its decision. The resolution stated plaintiffs had engaged in "numerous disputes and confrontations with Corporation staff and other residents," as well as "various violations of the House Rules, such as improper use of the package room, parking in unassigned spaces, and refusing to permit access to their apartment." It cited the March 12, 2020 notice and set forth the five incidents contained therein. The resolution also cited the March 17, 2021 notice and stated plaintiffs

21

"ha[d] refused, and continue[d] to refuse, to provide the Corporation access to the apartment." The resolution further stated because plaintiffs had not cured their objectionable conduct under paragraphs 31(e) and (f) of the lease, the Board was exercising its business judgment to terminate their stock and lease.

On July 2, 2021, the Corporation's counsel sent a notice to terminate plaintiffs' lease and stock to plaintiffs' counsel, citing plaintiffs' objectionable conduct and failure to provide access to the apartment as the basis for the Board's decision. The letter also advised plaintiffs needed to vacate the apartment by July 13, 2021. The letter further indicated it was sent to plaintiffs' counsel via email and certified and regular mail.

On July 9, 2021, plaintiffs filed an order to show cause with temporary restraints, challenging the Board's July 1, 2021 vote to terminate their stock and lease and seeking to enjoin the Corporation from requiring plaintiffs to deliver possession of the apartment and surrender their stock certificate. On August 9, 2021, the court entered an order stating, "[t]he parties have consented to submit their disputes concerning termination of plaintiffs' interest in [the Corporation] to mediation with the court-appointed mediator." The court also entered a separate order, requiring the Corporation to send, directly to plaintiffs, the notice of termination it had previously sent to their attorney. Thereafter, the parties

attended mediation but were unable to resolve the dispute.

On August 12, 2021, the Corporation filed an amended answer and counterclaim. In the amended counterclaim, the Corporation set forth the facts surrounding the two notices to cure it had sent plaintiffs and alleged plaintiffs had failed to provide them with access to their unit to investigate a water leak that arose in December 2020. The Corporation also added a fourth count to its counterclaim, seeking termination of plaintiffs' stock and the ejectment of plaintiffs from the apartment per the Board's July 1, 2021 vote.

On July 7, 2023, the Corporation moved for summary judgment on its counterclaim, seeking an order terminating plaintiffs' stock and lease and ejecting them from the apartment. That same day, plaintiffs cross-moved for summary judgment on the Corporation's counterclaim.

The court entertained oral argument and reserved its decision. On August 23, 2023, the court, as discussed more fully below, rendered an oral decision, granting summary judgment to the Corporation. The court found the Board appropriately terminated plaintiffs' stock and lease based on plaintiffs' objectionable conduct and failure to provide access to their apartment in connection with the leak. The court memorialized its decision in an order. In addition to terminating plaintiffs' stock and lease, the order stated the court was,

23

"on its own initiative, stay[ing] the enforcement of this [o]rder to afford . . . [p]laintiffs the opportunity, should they choose to file a motion for leave to [a]ppeal," and barring the Corporation from enforcing the order "until [the] resolution of any [a]ppellate filings."

Plaintiffs moved for reconsideration of the summary judgment order. The court denied plaintiffs' motion for reconsideration on September 22, 2023, finding plaintiffs "fail[ed] to raise any facts or issues not previously considered." On September 26, 2023, the trial court entered an amended order for summary judgment, clarifying the enforcement of the August 23, 2023 order was stayed for forty-five days, but it was not the intention of the court to stay the matter pending appeal.

The Corporation also moved for attorneys' fees in connection with its counterclaim, pursuant to the attorneys' fee provision in the lease, and plaintiffs opposed the application. On November 3, 2023, the court entered an order "direct[ing] the entry of the August 23, 2023 [or]der as a final judgment."

On November 14, 2023, plaintiffs filed a notice of appeal under Docket No. A-0795-23. On November 27, plaintiffs moved before this court to stay the trial court's August 23, 2023, September 26, 2023, and November 3, 2023 orders pending appeal. On November 30, 2023, the Corporation moved to dismiss the

24

appeal, arguing the matter was not ripe given the trial court had not yet issued an order on its motion for attorneys' fees.

On December 14, this court entered an order temporarily remanding the matter "to the trial court to issue its decision on [the Corporation]'s pending motion for counsel fees," providing "[e]ither party may appeal or cross-appeal that order," and any appeal "will be consolidated with the existing appeal." We then entered another order, staying the eviction pending the remand and any subsequent appeal.

During the remand period, plaintiffs moved to vacate the court's grant of summary judgment to the Corporation under Rule 4:50-1. On January 3, 2024, the trial court entered an order and statement of reasons, granting the Corporation's motion for attorneys' fees in the amount of $301,859.03. On January 5, 2024, the court held a conference with the parties, where it questioned whether it had jurisdiction to consider plaintiffs' Rule 4:50 motion, since there was a pending appeal. Thereafter, the court entered an order on January 19, 2024, denying plaintiffs' Rule 4:50 motion "based on [a] lack of jurisdiction per Rule 2:9-1."

On February 6, 2024, plaintiffs filed a notice of appeal under Docket No. A-1665-23, challenging the court's January 3, 2024 and January 19, 2024 orders.

We subsequently consolidated the appeals.

II.

A.

Plaintiffs challenge the court's summary judgment order entered in favor of the Corporation, arguing there were procedural and substantive deficiencies with the Board's decision. They assert the business judgment rule does not shield the Corporation's conduct because "rigid adherence to procedures" is required when a board seeks to impose discipline that would forfeit vested rights. They argue they did not receive proper notice pertaining to their alleged objectionable conduct because, pursuant to the lease and bylaws, the Board's secretary must serve the Corporation's notices, and the notices must be sent to a shareholder at the building, neither of which was done in this case. Plaintiffs contend under the Corporation's governing documents, a shareholder's objectionable conduct must be "repeated," and neither notice in this case referenced any repeated conduct by them. They further allege the June 24, 2021 notice of the July 1, 2021 Board meeting did not constitute proper service. Plaintiffs also assert the Board meeting was a "sham" and purposely scheduled for a date when plaintiffs were out of town and could not attend. Finally,

A-0795-23

plaintiffs argue there were disputed issues of fact concerning their alleged failure to provide access to their apartment.

We address plaintiffs' arguments utilizing familiar standards of summary judgment and appellate review. We review a grant of summary judgment de novo, applying the same standard as the motion judge. Samolyk v. Berthe, 251 N.J. 73, 78 (2022). That standard requires a determination be made as to "whether 'the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law.'" Branch v. Cream-O-Land Dairy, 244 N.J. 567, 582 (2021) (quoting R. 4:46-2(c)).

"To decide whether a genuine issue of material fact exists, the trial court must 'draw[] all legitimate inferences from the facts in favor of the non-moving party.'" Friedman v. Martinez, 242 N.J. 449, 472 (2020) (alteration in original) (quoting Globe Motor Co. v. Igdalev, 225 N.J. 469, 480 (2016)). "An issue of fact is genuine only if . . . the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact." R. 4:46-2(c). By comparison, "[t]o the extent that the grant or denial of summary judgment is

based on an issue of law, we owe no deference to an interpretation of law that flows from established facts." State v. Perini Corp., 221 N.J. 412, 425 (2015).

Membership in a cooperative corporation is not a traditional form of property ownership. See Presten v. Sailer, 225 N.J. Super. 178, 189 (App. Div. 1988) (noting "cooperative ownership is hybrid and sui generis"); Plaza Rd. Coop., Inc. v. Finn, 201 N.J. Super. 174, 180 (App. Div. 1985) (finding that a cooperative apartment association is a "unique form of property ownership"). Generally, a corporate entity is formed, and that entity has legal title to the real property of the cooperative. Presten, 225 N.J. Super. at 184-85. Individuals then purchase shares of the corporation's stock, enabling them to occupy a particular apartment within the cooperative. Id. at 185. The shareholder and the corporation typically enter into a proprietary lease, which provides the shareholder with an exclusive right of occupation. See Sulcov v. 2100 Linwood Owners, Inc., 303 N.J. Super. 13, 20 (App. Div. 1997); Presten, 225 N.J. Super. at 188 ("The proprietary lease grants an interest in real property."); N.J.S.A. 46:8D-3(k) (defining a proprietary lease as "a grant of a long[-]term exclusive right of possession and occupancy of a designated unit to a co[-]owner or a grant of a leasehold of the cooperative structure").

Because the cooperative takes the form of a corporation, corporate law

governs its internal management. Plaza Rd. Coop., Inc., 201 N.J. Super. at 180. Thus, a cooperative's governing body is entitled to the protection of the business judgment rule. See Comm. for a Better Twin Rivers v. Twin Rivers Homeowners' Ass'n, 192 N.J. 344, 369 (2007) (discussing the application of the business judgment rule in cases involving homeowners' associations); Alloco v. Ocean Beach & Bay Club, 456 N.J. Super. 124, 134-35 (App. Div. 2018) (affirming the application of the business judgment rule to the decision of a board of a homeowners' association); Sulcov, 303 N.J. Super. at 31 (noting the business judgment rule applies to decisions taken by a cooperative's board).

"The business judgment rule has its roots in corporate law as a means of shielding internal business decisions from second-guessing by courts." Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 175 (2011) (quoting Green Party v. Hartz Mountain Indus., 164 N.J. 127, 147 (2000)). If a board's decision is "made in good faith based on reasonable business knowledge," then it is "immune from liability from actions brought by others who have an interest in the business entity." Ibid. (quoting Green Party, 164 N.J. at 147). The rule creates "'a rebuttable presumption' that the actions of a Board are valid." Alloco, 456 N.J. Super. at 136 (quoting In re PSE & G S'holder Litig., 173 N.J. 258, 277 (2002)). The rule has a two-step inquiry: (1) whether the board's actions were authorized;

and (2) whether there was fraud, self-dealing, or unconscionable conduct.  See id. at 135; Seidman, 205 N.J. at 175.  The business judgment rule, however, does not apply to decisions that are beyond the authority of a cooperative's governing documents.  See Sulcov, 303 N.J. Super. at 31.

The challenger to the corporate action bears the burden of showing the board's action was tainted by fraud, self-dealing, or unconscionable conduct.  Alloco, 456 N.J. Super. at 136.  If the challenger meets their burden, the presumption is rebutted, and the burden shifts to the corporation to show the transaction was fair.  Ibid.

"[T]he relationship between a cooperative and its shareholders should be determined by its [c]ertificate, by-laws, and proprietary lease," and those documents "must be read together."  Sulcov, 303 N.J. Super. at 30.  The governing documents are analyzed under principles of contract interpretation.  See Boyle v. Huff, 257 N.J. 468, 477 (2024) (stating a condominium association's bylaws are subject to contract interpretation); Reilly v. Riviera Towers Corp., 310 N.J. Super. 265, 271 (App. Div. 1998) (noting the proprietary lease was the operative contract between the board of a cooperative and its shareholders).

This court reviews the trial court's interpretation of a contract de novo.

Barila v. Bd. of Educ. of Cliffside Park, 241 N.J. 595, 612 (2020). "It is well-settled that '[c]ourts enforce contracts based on the intent of the parties, the express terms of the contract, surrounding circumstances[,] and the underlying purpose of the contract.'" In re County of Atlantic, 230 N.J. 237, 254 (2017) (first alteration in original) (quoting Manahawkin Convalescent v. O'Neill, 217 N.J. 99, 118 (2014)) (additional internal quotation marks omitted). "The plain language of the contract is the cornerstone of the interpretive inquiry; 'when the intent of the parties is plain and the language is clear and unambiguous, a court must enforce the agreement as written, unless doing so would lead to an absurd result.'" Barila, 241 N.J. at 616 (quoting Quinn v. Quinn, 225 N.J. 34, 45 (2016)). An ambiguity exists if it appears that a term is "susceptible to at least two reasonable alternative interpretations." Chubb Custom Ins. Co. v. Prudential Ins. Co. of Am., 195 N.J. 231, 238 (2008). Because a court must enforce a contract as written, it cannot "rewrite a contract for the parties better than or different from the one they wrote for themselves." GMAC Mortg., LLC v. Willoughby, 230 N.J. 172, 186 (2017) (quoting Kieffer v. Best Buy, 205 N.J. 213, 223 (2011)).

Here, the trial court found the Corporation provided proper notice to plaintiffs. It first concluded the Corporation sent plaintiffs "numerous notices"

A-0795-23

of their objectionable conduct and their refusal to grant access to the apartment. The court noted the Corporation sent plaintiffs notice of the July 1, 2021 Board meeting via email and that it sent plaintiffs' counsel a notice of termination dated July 2, 2021. The court then stated, given the "protracted litigation[,] . . . it is unfathom[able] to suggest . . . plaintiff[s] weren't aware of the notices." It further noted the Corporation properly served the notices on plaintiffs' counsel, given there was litigation pending between the parties.

Regarding the access issue, the court concluded the docket reflected plaintiffs' failure to provide access to their apartment, namely, the court's April and May 2021 orders compelling plaintiffs to provide access. As for the termination due to plaintiffs' objectionable conduct, the court found the Board's actions were proper and fell within the protections of the business judgment rule. It further concluded plaintiffs' claims of the Board's bias and unconscionable conduct were "not substantiated."

Initially, we address plaintiffs' claim we should apply "heightened vigilance" in assessing the Board's exercise of its business judgment. In support of their claim, they cite two cases from New York courts: Horwitz v. 1025 Fifth Ave., Inc., 777 N.Y.S.2d 482 (N.Y. App. Div. 2004), and 13315 Owners Corp. v. Kennedy, 782 N.Y.S.2d 554 (N.Y. Civ. Ct. 2004). Both cases state courts

32

should apply "heightened vigilance" in assessing whether a board properly exercised its business judgment in circumstances where the board seeks to terminate a lease. See Horwitz, 777 N.Y.S.2d at 483; 13315 Owners Corp., 782 N.Y.S.2d at 565.

Both Horwitz and 13315 Owners Corp. cite another case, 40 W. 67th St. Corp. v. Pullman, 760 N.Y.S.2d 745 (N.Y. 2003), for the proposition a court should apply this heightened standard. See 777 N.Y.S.2d at 483; 782 N.Y.S.2d at 559-65, 568-71. In Pullman, the cooperative's shareholders voted to terminate the defendant's lease based on objectionable conduct. 760 N.Y.S.2d at 747. The court confirmed the business judgment rule applied to the cooperative's decision to terminate a lease. Ibid. It noted the defendant had adequate notice of the meeting to terminate, and the cooperative acted via supermajority vote and issued a resolution specifying its reasons for its actions, including findings related to the defendant's objectionable behavior. Id. at 752. Thus, regardless of the "heightened vigilance" standard, New York courts also apply the business judgment rule in circumstances concerning a cooperative's termination of a shareholder's lease. See id. at 747, 749-51.

Although some New Jersey cases have looked to New York law in matters involving cooperative associations, we are aware of no controlling authority in

this state where the "heightened vigilance" standard has been adopted, and we decline to do so here. See, e.g., Reilly, 310 N.J. Super. at 270 (looking to New York law concerning a cooperative's imposition of a sublet fee); Sulcov, 303 N.J. Super. at 29-30 (looking to New York case law on transfer fees imposed by cooperatives); Presten, 225 N.J. Super. at 186 (noting "New York seems to have had more experience with cooperative apartment developments than other states"). Accordingly, we apply the business judgment rule to this matter, as the trial court did, and not the heightened standard plaintiffs request.

Plaintiffs next argue they were not given proper notice of the notices to cure. Paragraph 27 of plaintiffs' lease states, "[a]ll notices . . . from either party . . . shall be in writing and sent by registered mail, return receipt requested," and if the notice was to the shareholder, "addressed to the [b]uilding." That same paragraph also provides either party could, "by notice served in accordance herewith[,] designate a different address for service of notices or demands."

The Corporation does not dispute it served the March 12, 2020 notice to cure on plaintiffs' counsel rather than on plaintiffs directly. However, the second notice, dated March 17, 2021, was served via regular and certified mail, in accordance with the lease. The question, therefore, is whether service of the March 12, 2020 notice on plaintiffs' attorney constituted proper notice.

34

We are satisfied the court did not err in finding plaintiffs had notice of the March 12, 2020 notice. As of March 2020, the parties were engaged in litigation, and plaintiffs had retained counsel. Plaintiffs' counsel acknowledged receiving the March 12, 2020 notice and advised his "clients [we]re working on a detailed factual response," and requested additional time to respond. The essence of notice provisions is to ensure parties receive proper notice. In 243 South Harrison Street Corp. v. Ogust, for example, the court noted the purpose of a lease termination provision requiring service by certified or registered mail is to ensure the defaulting party receives proper notice. 113 N.J. Super. 74, 78 (Cnty. Ct. 1971) (quoting E. Eighty-Second St. Corp. v. Rogers, 183 N.Y.S. 297, 300 (N.Y. App. Div. 1920)) (holding the intent of the parties, evidenced by the certified and registered mail provision of the lease, sought "to insure the delivery of the notice, and to settle any dispute that might arise between the parties as to whether or not the notice was duly received"). Here, there is no dispute plaintiffs' counsel received the March 12, 2020 notice from the Corporation. Our courts prioritize the objective of notice—actual receipt—over the precise method of delivery specified in the contract. The purpose of notice provisions is not to rigidly enforce the specified method of delivery but to ensure proper notice to the defaulting party, which service of the March 2020 notice on

35

plaintiffs' counsel accomplished here.[7]

We are likewise unpersuaded by plaintiffs' assertion the Board's secretary was required to issue the notice to cure. Article IV, section 4 of the bylaws required the secretary to "attend to the giving and serving of all notices of the Corporation . . . ." The plain language of this section does not require the secretary to personally sign and serve all notices. Accordingly, we determine the court did not err in permitting the service of the notice to cure to be delegated to the Corporation's counsel.

Moreover, we are unconvinced by plaintiffs' argument the Board could not terminate their lease and stock based upon their objectionable conduct because there was no demonstration they engaged in objectionable conduct that was "repeated after written notice" under paragraph 31(f) of the lease.

The language of the lease allows for termination of the lease if the shareholders repeated their objectionable conduct after written notice. Because we determined plaintiffs were properly served the March 2020 notice, the

---

[7] We are also mindful of the Corporation's concern that because the parties were in litigation, Rule of Professional Conduct (RPC) 4.2 prohibited counsel from directly communicating with plaintiffs. RPC 4.2 states an attorney should not communicate directly with a party they know is represented by counsel in a dispute. Matter of Robertelli, 248 N.J. 293, 318 (2021).

A-0795-23

Board's March 2021 notice was sufficient to put plaintiffs on notice of their continued objectionable conduct. Plaintiffs argue the notices did not contain any "overlapping" conduct. However, the lease did not require repeated conduct in the sense that plaintiffs had to engage in identical conduct involving the same residents or staff. Rather, the provision only required the Corporation identify repeated objectionable conduct, which it did in its March 2021 notice.

Plaintiffs' challenge to the June 24, 2021 notice also fails because that was a notice of a Board meeting, not a shareholders meeting. As to Board meetings, the bylaws state as little as two days' notice could be provided to directors, and the notice could be served personally, by mail or by telephone. Plaintiffs were emailed notice of the meeting. The Corporation notes, in addition to emailing the notice to all shareholders, the notice was also posted in the common areas of all six of the Corporation's buildings, with the agenda "as required by . . . N.J.A.C. 5:26-8.12(c)." Furthermore, plaintiffs' assertion the Corporation prevented them from attending the July 1, 2021 Board meeting is unavailing, given the meeting was held virtually. Although plaintiffs were out of town, it is unclear why this would have prevented them from attending the virtual meeting.

Plaintiffs also challenge the merits of the trial court's decision, arguing there were disputes of fact that should have precluded the entry of summary

37

judgment. First, the record contains multiple security incident reports and police reports corroborating the objectionable conduct. The record also shows plaintiffs continued to berate the Corporation's staff after receiving the March 2020 notice to cure.

Plaintiffs fault the Board for failing to investigate the incidents of objectionable conduct. However, the Board members testified they reviewed the security incident reports, police reports, and security footage before voting to terminate plaintiffs' stock and lease. Moreover, plaintiffs do not allege on appeal the Board's vote was a product of fraud, self-dealing, or unconscionable conduct, which is necessary to overcome the presumption of validity under the business judgment rule. Thus, the record supports the instances of objectionable conduct.

Likewise, the court did not err in its determination there were no issues of fact in dispute regarding plaintiffs' failure to provide access to their apartment. Paragraph 25 of the lease provided the Corporation had a right to access a shareholder's apartment, at a reasonable time and upon notice, to make or facilitate repairs. Further, paragraph 31(e) provided the Corporation could terminate the shareholder's lease if the shareholder was in default of any provision under the lease and such default continued for thirty days after being

38

provided with notice.

The Corporation provided plaintiffs with written notice of their default under the lease and their violations of paragraph 25 of the lease via the March 17, 2021 notice to cure. Thirty days later, on April 16, 2021, the court entered an order compelling plaintiffs to provide access to their apartment. Thirty-four days after that (and sixty-four days from the March 17 notice), the court entered another order compelling plaintiffs to provide dates for the Corporation to access their apartment to address the December 2020 water leak. The record shows the Corporation did not obtain access to plaintiffs' apartment until July 21, 2021, well after the Board's vote to terminate plaintiffs' lease and stock on July 1, 2021. Therefore, based on this record, the court did not err in concluding the Board had a proper basis to vote to terminate plaintiffs' stock and lease.

Plaintiffs' statement of material facts in support of their cross-motion for summary judgment did not address the merits of the access issue.[8] And, in plaintiffs' response to the Corporation's statement of material facts, they

---

[8] At oral argument, plaintiffs' counsel asserted "access was ultimately provided," but he could not direct the court towards any document in the record supporting that argument.

admitted only they provided access to their unit on July 22, 2021.[9]  On appeal,

plaintiffs rely upon Melissa's certification, which sought to vacate the summary

judgment order, in support of their Rule 4:50-1 motion to argue they provided

access to their apartment in a timely manner.  However, that motion was filed

after the court granted the Corporation's motion for summary judgment, and, as

such, the facts in the certification were not before the trial court when it ruled

on the summary judgment motions.  Thus, those facts do not provide a basis for

reversal.

Plaintiffs also contend the Corporation failed to raise the access issue in

their counterclaim and "no amended pleading making any relevant allegations

was ever filed."  However, the record reflects the Corporation amended its

counterclaims on August 12, 2021.  The amended counterclaims clearly set forth

facts related to the December 2020 leak and the access issues.

We reiterate that on April 16, 2021, the trial court ordered plaintiffs to

give the Corporation access to their apartment on or before April 23.  When

plaintiffs failed to grant access, the court, on May 20, 2021, again issued an

order requiring plaintiffs to allow the Corporation access to their property.  In

---

[9]  This date appears to be a typo, since in Melissa's certification in support of plaintiffs' Rule 4:50-1 motion, she certified she provided access to the unit on July 21, 2021.

sum, as of July 1, 2021, plaintiffs were in default for more than thirty days under paragraph 25 of their lease for failing to provide the Corporation access to their unit, and accordingly, we discern no error in the court's conclusion the Board was authorized to terminate their stock and lease.

## B.

Plaintiffs further argue the trial court erred in declining to consider their Rule 4:50-1 motion because the rule requires a motion to vacate an order be filed with the trial court. They contend Melissa's certification, filed in support of plaintiffs' motion to vacate the trial court's grant of summary judgment to the Corporation, raised genuine disputed facts regarding the access issues. Plaintiffs further contend because the Appellate Clerk's Office refrained from issuing a briefing schedule for the appeal until all proceedings before the trial court had concluded, the trial court had authority to hear the motion without infringing on our jurisdiction.

We review a trial court's decision on a Rule 4:50-1 motion with "substantial deference" and note we should not reverse the trial court unless there was "a clear abuse of discretion." U.S. Bank Nat'l Ass'n v. Guillaume, 209 N.J. 449, 467 (2012).

Rule 4:50-1 allows a trial court to set aside a final judgment or order for

41

the following reasons:

> (a) mistake, inadvertence, surprise, or excusable neglect; (b) newly discovered evidence which would probably alter the judgment or order and which by due diligence could not have been discovered in time to move for a new trial under Rule 4:49; (c) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (d) the judgment or order is void; (e) the judgment or order has been satisfied, released or discharged, or a prior judgment or order upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment or order should have prospective application; or (f) any other reason justifying relief from the operation of the judgment or order.
>
> [(citation reformatted).]

Relief under the rule "is available only in 'exceptional circumstances.'" 257-261 20th Ave., Realty, LLC v. Roberto, 259 N.J. 417, 436 (2025) (quoting Hous. Auth. of Morristown v. Little, 135 N.J. 274, 290 (1994)).

Here, plaintiffs filed a notice of appeal under Docket No. A-0795-23 on November 14, 2023, challenging the August 23, 2023 grant of summary judgment to the Corporation. On December 14, 2023, we temporarily remanded for a decision on the then-pending application for attorneys' fees. Plaintiffs filed

42

their Rule 4:50-1 motion[10] to vacate on December 27, 2023, and the trial court denied it based on lack of jurisdiction on January 19, 2024.

When plaintiffs filed their motion to vacate under Rule 4:50-1, this matter was already on appeal. The scope of the limited remand was confined to the Corporation's attorneys' fee application. Accordingly, the court did not misuse its discretion when it determined it did not have jurisdiction under Rule 2:9-1 to consider the application. See In re Application of Plainfield-Union Water Co., 14 N.J. 296, 302 (1954) (noting the filing of a notice of appeal "divests the lower court of jurisdiction save as reserved by statute or rule" and such jurisdiction is restored only pursuant to mandate by this court). Unless it is to correct or enforce an order, "the ordinary effect of the filing of the notice of appeal is to deprive the [trial] court . . . of jurisdiction to act further in the matter under appeal unless directed to do so by the appellate court." Pressler & Verniero, Current N.J. Court Rules, cmt. 1 on R. 2:9-1 (2026).

After the Corporation moved to dismiss the appeal as interlocutory, we determined a limited remand was necessary to allow the trial court to decide the pending motion for attorneys' fees. See State v. Hogue, 175 N.J. 578, 583 (2003)

---

[10] The record does not indicate which subsection of Rule 4:50-1 plaintiffs relied upon in their motion.

43

(noting "[a] limited remand to the trial court pending an appeal is appropriate" when it is necessary for the full resolution of a case).

The trial court did not have jurisdiction to hear plaintiffs' motion to vacate. While styled as a motion under Rule 4:50-1, plaintiffs' arguments read more as an attempt to relitigate the summary judgment motion. Plaintiffs argue Melissa's certification, attached to their Rule 4:50-1 motion, sought to raise "considerable questions of fact" as to the access issues. However, the appropriate time to raise those issues of fact would have been in opposition to the Corporation's motion for summary judgment. A Rule 4:50-1 motion is intended to apply to instances to correct "a grave injustice," not to be a proverbial second bite at the apple. See Hous. Auth. of Morristown, 135 N.J. at 289. Accordingly, the trial court did not misapply its discretion in denying plaintiffs' motion.

C.

Plaintiffs also challenge the court's grant of attorneys' fees to the Corporation. They first assert the unilateral attorneys' fee provision under the lease violates New Jersey public policy. Next, they contend under the plain language of the lease, the Corporation was not entitled to recover fees incurred in pursuing a counterclaim unrelated to plaintiffs' affirmative claims. Finally, plaintiffs insist the attorneys' fee application was vague, irrelevant, and included

44

administrative time and block billing.

We conclude the lease plainly provided for attorneys' fees with regard to a counterclaim, and plaintiffs' argument this provision violates public policy is unpersuasive. The trial court also conducted a thorough review of the time entries and appropriately struck vague and double billing entries.

"In general, New Jersey disfavors the shifting of attorneys' fees." Litton Indus., Inc. v. IMO Indus., Inc., 200 N.J. 372, 385 (2009). "However, 'a prevailing party can recover those fees if they are expressly provided for by statute, court rule, or contract.'" Ibid. (quoting Packard-Bamberger & Co. v. Collier, 167 N.J. 427, 440 (2001)). "When the fee-shifting is controlled by a contractual provision, the provision should be strictly construed in light of our general policy disfavoring the award of attorneys' fees." Ibid.

Regarding the amount of fees, "a reviewing court will disturb a trial court's award of counsel fees 'only on the rarest of occasions, and then only because of a clear abuse of discretion.'" Id. at 386 (quoting Packard-Bamberger, 167 N.J. at 444). "The threshold issue in determining whether an attorneys' fee award is reasonable is whether the party seeking the fee prevailed in the litigation." N. Bergen Rex Transp., Inc. v. Trailer Leasing Co., 158 N.J. 561, 570 (1999). "[T]he party must establish that the 'lawsuit was causally related to securing the

relief obtained; a fee award is justified if [the party's] efforts are a necessary and important factor in obtaining the relief.'" Litton, 200 N.J. at 386 (second alteration in original) (quoting N. Bergen, 158 N.J. at 570). The party must also "show that 'the relief granted had some basis in law.'" N. Bergen, 158 N.J. at 571 (quoting Singer v. State, 95 N.J. 487, 494 (1984)).

Rule 4:42-9(b), which governs attorneys' fees, requires "all applications for the allowance of fees [to] be supported by an affidavit of services addressing the factors enumerated by RPC 1.5(a)." See also Litton, 200 N.J. at 386-87. The factors enumerated by RPC 1.5(a) are:

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
>
> (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
>
> (3) the fee customarily charged in the locality for similar legal services;
>
> (4) the amount involved and the results obtained;
>
> (5) the time limitations imposed by the client or by the circumstances;
>
> (6) the nature and length of the professional relationship with the client;
>
> (7) the experience, reputation, and ability of the lawyer

or lawyers performing the services;

(8) whether the fee is fixed or contingent.

The trial court issued a comprehensive, well-reasoned written decision examining the Corporation's request for attorneys' fees. The court rejected plaintiffs' claim that under the plain language of the lease, the Corporation was not entitled to recover fees related to its counterclaims. The trial court also reviewed the RPC 1.5(a) factors. It determined the hourly rate the Corporation's attorneys charged was reasonable in light of the attorneys' experience and background, and the rates were below the industry standard. The court also found the fee was reasonable based on the time and labor required in the case, noting plaintiffs "aggressively pursued their claims and resisted and opposed virtually all discovery requests from the Corporation as well as [those from] other defendants." It recognized the amount of fees the Corporation requested was "unusual" but that the amount was warranted given plaintiffs' aggressive litigation tactics and the fact the Corporation succeeded on its ejectment claim.

Regarding plaintiffs' arguments, the court determined, under the plain language of the lease, all fees the Corporation incurred in defending against plaintiffs' claims or pursuing its counterclaims were warranted. It found the entries relating to the access issues were warranted because plaintiffs' failure to

A-0795-23

allow access to their apartment provided the basis for the Corporation's ejectment action. As for plaintiffs' claims of block billing, the court stated it was "an acceptable practice." It rejected plaintiffs' argument the Corporation's attorneys billed for purely administrative time. However, the court found there were multiple entries that consisted of double billing and accordingly deducted $2,975 from the total fee award. Additionally, it found several vague entries totaling $1,969.50 and deducted that amount from the fee award. In total, the court awarded the Corporation $301,859, representing $293,283 in fees and $8,576 in costs.

Paragraph 28 of plaintiffs' lease provided as follows:

> If the [l]essee is at any time in default hereunder and the [l]essor incurs any expense (whether paid or not) in performing acts which the [l]essee is required to perform, or in instituting any action or proceeding based on such default, or defending or asserting a counterclaim in any action or proceeding brought by the [l]essee, the expense thereof to the [l]essor, including reasonable attorneys' fees and disbursements, shall be paid by the [l]essee to the [l]essor, on demand, as additional rent.

As the trial court correctly noted, the plain language of the lease authorizes the Corporation to recover attorneys' fees in connection with "defending or asserting a counterclaim." As long as the Corporation's claim is related to a shareholder's default under the lease, paragraph 28 allows it to recoup attorneys' fees and

costs. Plaintiffs seek to add additional language, narrowing the scope of the fees provision to only those counterclaims related to their affirmative claims. However, it is well established a court cannot "rewrite a contract for the parties better than or different from the one they wrote for themselves." Kieffer, 205 N.J. at 223. Moreover, the counterclaim arguably could have been asserted in a separate action, and the Corporation would have been entitled to fees under those circumstances. Accordingly, plaintiffs' argument is unpersuasive.

Plaintiffs allege a unilateral fee shifting provision violates New Jersey's public policy because it encourages a party, such as the Corporation here, to assert retaliatory counterclaims and "litigate relentlessly." We are unconvinced because the plain language of the provision applied to circumstances where a shareholder defaulted on their lease obligations. The provision encourages shareholders to abide by their lease obligations. It does not encourage litigation but rather discourages shareholder conduct or actions that would run afoul of their lease.[11]

Plaintiffs have also failed to provide any authority to support their public

---

[11] Notably, the trial court found plaintiffs had "chose[n] to vigorously litigate the diverse aspects of the case," continuously engaged in aggressive motion practice, and hindered discovery.

 A-0795-23

policy argument. While certain states, like California, have enacted laws preventing one-sided attorneys' fees clauses, see Cal. Civ. Code § 1717, New Jersey has no such categorical prohibition. The New Jersey Legislature has only prohibited unilateral fee shifting provisions in the context of residential leases. See N.J.S.A. 2A:18-61.66. The Legislature has not enacted any such statutes relating to cooperative agreements. Moreover, this statute does not apply in this case because our courts recognize "the relationship between the association and a cooperative shareholder is not that of landlord and tenant." See Presten, 225 N.J. Super. at 185-86. Because New Jersey law allows parties to provide for fee shifting provisions in contracts, there is no support for plaintiffs' assertion such a unilateral provision violates public policy.

Next, plaintiffs contend they should not be responsible for attorneys' fees because of the "numerous substantive deficiencies in the claimed fees." Plaintiffs argue they should not be liable for entries that constitute block billing. They further assert many of the billing entries do not set forth reasonable descriptions of the billing activity, "mak[ing] the reader guess whether the entr[ies are] related to the ejectment" or pertain to matters unrelated to the subject matter of this action, such as the Kopelman battery and defamation claim.

We affirm the trial court's findings regarding its calculation of attorneys' fees substantially for the reasons set forth in the court's cogent written opinion. We add the following comments.

"Block-billing involves 'group[ing] together multiple tasks without specifying how much time each task took.'" NLRB v. Bannum, Inc., 102 F.4th 358, 364 (6th Cir. 2024) (alteration in original) (quoting Miller v. Caudill, 936 F.3d 442, 452 (6th Cir. 2019)). It "is a common practice which itself saves time in that the attorney summarizes activities rather than detailing every task," and such billing should be upheld if the listed activities reasonably correspond to the number of hours billed. U.S. ex rel. John Does I-II v. Pa. Blue Shield, 54 F. Supp. 2d 410, 415 (M.D. Pa. 1999). While a substantial number of vague task descriptions may be a reason to exclude certain billing entries, it is not a reason to exclude the entire block. Block billing is not per se improper in New Jersey, and the more appropriate approach for a court is to look at the entire block, compare the listed activities and the time spent, and determine whether the hours reasonably correlate to all of the activities performed. Our Supreme Court has stated, "[i]t is not necessary to know the exact number of minutes spent nor the precise activity to which each hour was devoted nor the specific attainments of each attorney." Rendine v. Pantzer, 141 N.J. 292, 337 (1995) (quoting Lindy

51

Bros. Builders, Inc. of Phila. v. Am. Radiator & Standard Sanitary Corp., 487 F.2d 161, 167 (3d Cir. 1973)).  Rather, the court's task is to examine the billing entries and determine if they are reasonable and accurate and whether the hours billed correspond to the tasks completed.  Ibid.

Here, plaintiffs challenge several block billing entries.  The court stated it reviewed these entries "and determined[,] . . . by looking at the entire block and comparing it to the listed activities in the block, these [entries] [we]re reasonable."  It noted the Corporation provided a "detailed, annotated analysis of the bills" it submitted.  In short, the court determined the entries were specific enough for it to determine the amount billed was reasonable.  The court was familiar with the extensive litigation in this matter, "which . . . resulted in unparallel[ed] motion practice and animosity" and over 1500 entries in the court docket.[12]  The court did not passively accept the Corporation's submission but rather properly reviewed the billing entries and provided a basis for its approval of the fees.  We discern no error.

Plaintiffs also challenge several entries, alleging some entries are not recoverable because they are not related to the Corporation's counterclaim.  Here, the court found the entries which related to the other claims in the case

_____

[12]  The Corporation notes plaintiffs filed over 225 motions in this case.

were "inextricabl[y] intermingled" with the counterclaims. For instance, plaintiffs contend the Corporation is not entitled to fees for attending municipal court proceedings. It appears while this litigation was pending, there was also a municipal court matter involving Kopelman and plaintiffs arising out of the September 4, 2018 incident. The trial court found these entries were reasonable because they were related to the Corporation's counterclaim against plaintiffs. In fact, the Corporation cited the incident involving Kopelman in its counterclaim as further evidence of plaintiffs' disruptive conduct within the building.

There were also several entries for communications with the Corporation's insurance counsel, who defended against plaintiffs' affirmative claims. Again, it is reasonable the Corporation's attorneys would be in communication with the insurance counsel that was defending the Corporation from plaintiffs' claims, since the affirmative claims and the counterclaims were related. Plaintiffs highlight entries related to the counterclaim regarding the objectionable conduct and the access issues, communications with the court, and responding to motions or discovery issues in the case, all of which were reasonable and necessary for counsel's representation of the Corporation's case. We are unpersuaded the court erred in its conclusion.

53

As for plaintiffs' argument there were time entries for administrative tasks, we agree with the trial court these entries were not purely for administrative time. The bills reflect these entries relate to discovery issues, such as redacting documents for production and reviewing the court's scheduling orders. Attorneys carried out these tasks, which involved work an administrative staff member could not carry out, such as reviewing documents for privilege. Thus, we conclude the court did not misapply its discretion in rejecting plaintiffs' argument.

Finally, plaintiffs challenge numerous entries on the grounds they were vague and not specific enough. Notably, plaintiffs also contended before the trial court there were certain double billing entries in the Corporation's records. The trial court agreed, in part, with plaintiffs and found certain entries were indeed vague. The court also found there were certain items that constituted double billing and made appropriate reductions for those items. We agree the court appropriately identified certain vague entries, some of which simply stated "Communication," "Correspondence," and "Review," among other general terms. However, aside from the entries the court identified, the remaining entries appear specific enough to discern the activities the attorneys carried out. In sum, the court conducted a painstaking review of the time entries, and there

A-0795-23

is no evidence the court misapplied its discretion by failing to deduct other entries for vagueness.

We further observe the court appropriately reviewed each of the factors set forth in RPC 1.5(a) and made detailed findings on each. Further, while the total award is substantial, this case involved complex legal claims and extensive discovery and motion practice that spanned nearly four years. In light of that background, the court did not misapply its discretion in concluding the counsel fees were reasonable.

To the extent we have not specifically addressed any remaining arguments plaintiffs raised, we conclude they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division

55